**United States District Court**
**District of Massachusetts**

| | |
|---|---|
| United States of America <br><br>                v. <br><br> Reshat Alkayisi, et. al, <br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Criminal Action No.**
**21—CR-10208-NMG**

**MEMORANDUM & ORDER**

GORTON, J.

     This case involves charges arising from an investigation into a drug and money laundering conspiracy.  Pending before the Court are four motions to suppress filed by three defendants. The Court considers each motion in turn and,for the reasons set forth below, all four motions will be denied.

I.  <u>Alkayisi Motion to Suppress</u>

     **A. Factual Background**

   In October, 2020, the Federal Bureau of Investigation ("FBI") commenced an investigation into potential drug trafficking activity in New England.  Although that inquiry initially centered on James Holyoke ("Holyoke"), it soon expanded after a cooperating witness completed a series of controlled purchases of methamphetamine from Holyoke and his supplier, Reshat

Alkayisi ("Alkayisi").  By April, 2021, the government had
seized approximately 12 pounds of pure methamphetamine as a
result of controlled purchases.

On May 5, 2021, the government submitted an application
seeking authorization to intercept wire and electronic
communications to and from the telephone of Alkayisi pursuant to
Title III of The Omnibus Crime Control and Safe Streets Act of
1968 ("Title III").  In support of that order, the government
submitted an affidavit from FBI Special Agent Maria Classon
("Special Agent Classon").  United States District Judge Denise
J. Casper found probable cause to believe that Alkayisi and
others were engaged in the commission of multiple criminal
offenses and issued the requested Order ("the May Order"), which
permitted the government to intercept Alkayisi's telephone
communications for 30 days.

In the May Order, Judge Casper directed the government to
take steps necessary to minimize the intrusion into Alkayisi's
communications.  Among other things, the May Order required
agents to terminate interceptions immediately when they
determined the conversation was unrelated to communications
covered by the Order.

On June 4, 2021, the government returned to Judge Casper,
seeking an order permitting interception of Alkayisi's

communications for another 30 days.  The government submitted a second affidavit from Special Agent Classon.  Upon review, Judge Casper found probable cause to believe Alkayisi, his wife Christine Lua and his girlfriend Kelsie Seiden were all engaged in criminal activity.  Judge Casper issued the requested order ("the June Order"), which included identical minimization requirements to the May Order and which again required the government to file periodic progress reports.

After Judge Casper granted both the May Order and June Order, a supervising Assistant United States Attorney ("AUSA") provided a copy of the minimization memorandum and order to agents responsible for monitoring the intercepted communications.  The AUSA also held a meeting to review the minimization requirements.  Monitoring agents certified that they had reviewed the relevant Order and associated minimization requirements.

Once the investigation was under way, government investigators submitted status reports every 15 days to Judge Casper. They also maintained a running list of relevant players and information collected on a white board in the wire room so that they could track their progress.

During the 60 days the orders were in effect, investigators intercepted several communications which indicated Alkayisi

-3-

orchestrated narcotics transactions.  Law enforcement quickly identified Lua and Seiden as romantic interests of Alkayisi, and by the end of that period, intercepted communications had led them to believe both were at least aware of, if not involved in, Alkayisi's drug trafficking activity.  Alkayisi regularly provided updates on his drug trafficking activity to Lua and Seiden via call and text.

On May 12, 2021, just a week after the May Order, interceptions indicated Alkayisi was engaging in drug deliveries.  When Seiden asked Alkayisi if he was just dropping off "stuff" or also collecting money, Alkayisi responded, "both". On June 1, 2021, law enforcement had reason to believe Alkayisi received UPS packages containing methamphetamine.  That morning, Alkayisi texted Seiden, "We received all packages," to which she responded, "Tha k [sic] god!!!!"  On June 12, 2021, Alkayisi had similar conversations with both Seiden and Lua during which he suggested he would collect money from a source of his methamphetamine supply.

While some calls between Alkayisi and Seiden and Alkayisi and Lua were strictly personal in nature, other calls consisted of both personal and incriminating conversation.  For example, during a May 21, 2021 call, Alkayisi abruptly began discussing a recent increase in business during a personal discussion with

-4-

Lua.  In response, Lua warned Alkayisi to avoid law enforcement
detection.

### B. Motion to Suppress

In support of his motion to suppress evidence obtained
pursuant to the Title III orders, Alkayisi contends that the
government failed to minimize non-pertinent calls properly, as
required by Title III.  Specifically, he argues that more calls
between him and his wife, Lua, and between him and his
girlfriend, Seiden, should have been minimized.  Accordingly, he
requests that all evidence derived from the wiretap orders be
suppressed.

### C. Legal Standard

Title III requires the government to conduct its
surveillance "in such a way as to minimize the interception of
communications not otherwise subject to interception." 18 U.S.C.
§ 2518(5).  A reviewing court must determine whether the
government's efforts to minimize were reasonable following an
objective assessment of its actions, given the facts and
circumstances it confronted. United States v. Scott, 436 U.S.
128, 136-37 (1978).  When making this determination, a reviewing
court should look at several factors, including:

    1) the nature and complexity of the suspected crimes;
    2) the thoroughness of the government's precautions to

bring about minimization; and 3) the degree of
judicial supervision over the surveillance process.

United States v. Gordon, 871 F.3d 35, 48 (1st Cir. 2017).

"Blanket suppression of wiretap evidence is a 'drastic'
remedy, which should be reserved for the most 'egregious'
cases." Id. (quoting United States v. Hoffman, 832 F.2d 1299,
1309 (1st Cir. 1987)).  Where a defendant does not identify any
calls that he believes should be minimized,

> the relevant question reduces to whether the
> government's handling of its minimization
> responsibilities was so egregious as to support a
> blanket exclusion of the evidence obtained through
> wiretapping.

Id. at 47-48.

Courts reviewing a challenge to the government's
minimization effort generally look to the percentage of calls
minimized out of those lasting more than two minutes. Id. at 49.
The government has broader latitude early in an investigation
when the nature and scope of the conspiracy is still unknown.
Scott, 436 U.S. at 141.  Furthermore, "[t]he need to allow
latitude to eavesdroppers is close to its zenith" in drug
trafficking conspiracies where the substances involved are
"easily concealed, easily transported" and "likely to implicate
international or at least interstate interests." Hoffman, 832
F.2d at 1308.

-6-

**D. Application**

The minimization efforts of the government, when viewed in light of the facts and circumstances it confronted, were plainly reasonable.

Despite Alkayisi's broad assertions, he fails to identify a single call that should have been minimized.  As a result, this Court may only order the suppression of all wiretap evidence if the government's conduct "was so egregious as to support a blanket exclusion of the evidence obtained through wiretapping." Gordon, 871 F.3d at 47-48.

The government's conduct in the case at bar was far from egregious.  To the contrary, it made substantial efforts to minimize its interception of non-pertinent calls. A review of the factors identified in Gordon makes this point clear.

First, the wiretaps were conducted during a complex, multi-defendant drug trafficking investigation.  Law enforcement was still in the process of identifying potential targets and understanding the scope of the conspiracy at the time of those wiretaps.  The fact that, while issuing the June Order, Judge Casper found probable cause to believe Lua and Seiden were engaged in criminal activity bolsters the government's contention that it needed to monitor Alkayisi's communications with those individuals.

-7-

Second, the government took thorough precautions to avoid undue intrusion.  Monitoring agents were required to certify that they reviewed the order before they could monitor intercepted communications, and the supervising AUSA examined the minimization requirements with the agents, emphasizing their importance.  These precautions appear to have worked.  Even though both Lua and Seiden were targets in the investigation, the government managed to minimize a majority of calls over two minutes between Alkayisi and Lua and Alkayisi and Seiden.[1]

Finally, the degree of judicial supervision supports the reasonableness of the government's minimization effort.  In addition to issuing the May and June orders, Judge Casper also received regular status reports on the government's wiretaps.

If there was a pattern of agents listening to calls after it became clear that they were innocuous, as Alkayisi alleges, then "it should have been easy to find quite a few examples of non-minimized calls that obviously should have been minimized." Gordon, 871 F.3d at 49.  Alkayisi provides no such examples, and the government has provided ample support for the reasonableness of its minimization efforts.  Alkayisi's motion will be denied.

_____

[1] In its memorandum, the government explains that the monitoring agents minimized at least 70% of calls lasting more than two minutes between Alkayisi and Lua and at least 61% of calls over two minutes between Alkayisi and Seiden.

## II. <u>Dzabiev Motion to Suppress</u>

### A. Factual Background

On January 6, 2021, law enforcement conducted surveillance on Holyoke in advance of a controlled purchase of methamphetamine.  That same day, Holyoke met with Alkayisi at a Rhode Island hotel before the two separated.  Investigators followed Alkayisi, who approached a vehicle registered to Emil Dzabiev ("Dzabiev") at the Square One Mall in Saugus, Massachusetts.

Law enforcement began intercepting Alkayisi's communications months later in May, 2021.  According to investigators, during an intercepted call with Eric Daneault on May 11, 2021, Alkayisi agreed to sell methamphetamine directly to Daneault, and asked him to meet at the Square One Mall in Saugus, the same mall at which Alkayisi met Dzabiev in January. Alkayisi informed Daneault that he regularly met there because he had "another guy coming in from Maine."

Two days later, on May 13, 2021, investigators intercepted a call in which Dzabiev asked Alkayisi for a meeting.  Alkayisi informed Dzabiev that he was in California but that they could meet on May 20.  Dzabiev told Alkayisi that he needed to "tell people this stuff," to which Alkayisi responded, "I'll tell people who pay up front."  Dzabiev initially asked to meet

Alkayisi at the airport but Alkayisi explained he needed to return to Boston to "grab a bag" for Dzabiev.

On May 20, 2021, law enforcement intercepted communications that confirmed Alkayisi and Dzabiev would meet that day.  During one call, Dzabiev warned that he was running late.  Alkayisi responded that he could not have "people buying 20, 30 pounds" waiting, and that he was "not going to tell them no for one pound."  The two eventually agreed to meet at a Starbucks in Braintree, Massachusetts.

That afternoon, investigators observed Dzabiev and Alkayisi park next to each other at the South Shore Plaza Mall in Braintree.  Dzabiev got out of his vehicle, passed a white paper bag to Alkayisi and received a white package in return.

After the meeting concluded, law enforcement followed Dzabiev as he traveled north on I-95 toward Maine.  After observing Dzabiev at speeds over 90 miles per hour, investigators requested Maine State Police to conduct a traffic stop.  Less than three minutes into the stop, Maine State Police used a narcotics K-9 to circle the vehicle.  The K-9 indicated he detected the presence of narcotics in the vehicle.  The police then searched Dzabiev's vehicle and uncovered one pound of methamphetamine, fentanyl, cocaine and approximately $5,800 in cash.  The search lasted approximately 25 minutes, after

which the officers conversed with Dzabiev and later permitted him to leave.

**B. Motion to Suppress**

Dzabiev moves to suppress all evidence obtained during the search of his automobile on May 20, 2021.  He alleges his Fourth Amendment rights were violated and argues (1) the traffic stop was not supported by probable cause, (2) the subsequent search of his vehicle was not reasonable since he was not placed under arrest during the stop, (3) law enforcement did not have probable cause to search the vehicle and (4) law enforcement improperly extended the stop beyond an investigation of a traffic violation.  Dzabiev requests a hearing on this motion.

**C. Legal Standard**

An officer may initiate "a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" Kansas v. Glover 140 S. Ct. 1183, 1187 (2020) (quoting United States v. Cortez, 449 U. S. 411, 417-418 (1981)).  The encounter must be justified at its inception and be reasonable in scope and duration. United States v. Pontoo, 666 F.3d 20, 26 (1st Cir. 2011).  An encounter is justified at its inception if the officer has "reasonable, articulable suspicion that criminal

activity is afoot." United States v. Romain, 393 F.3d 63, 71

(1st Cir. 2004).

> In making a reasonable-suspicion determination, a court

> must look at the 'totality of the circumstances' . . .
> to see whether the detaining officer has a
> particularized and objective basis for suspecting
> legal wrongdoing . . . .  [O]fficers [may] draw on
> their own experience and specialized training to make
> inferences from and deductions about the cumulative
> information available to them.

United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal

quotation marks and citations omitted).  Although an officer

must rely on more than a hunch, "the likelihood of criminal

activity need not rise to the level required for probable cause

. . . ." Id. at 274.

> An officer can make a stop

> if he sees a driver commit a traffic offense, even if
> the stop is just an excuse to investigate something
> else.

United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011)

(citing Whren v. United States, 617 U.S. 806, 810 (1996)).

While a traffic stop is typically a brief encounter to address a

traffic violation, "such a stop can be extended where there is

reasonable suspicion of further criminal wrongdoing." United

States v. Cruz-Rivera, 14 F.4th 32, 43 (1st Cir. 2021).

To justify a stop in the context of an investigation, moreover, an officer may rely on the collective or pooled knowledge of other officers. Knowledge can be imputed to an officer acting "in accordance with the direction of another officer who has reasonable suspicion." United States v. Barnes, 506 F.3d 58, 63 (1st Cir. 2007).

Where officers have probable cause to believe that an automobile contains contraband, they may conduct a warrantless search of the vehicle and of any containers therein and seize any such evidence. California v. Acevedo, 500 U.S. 565, 580 (1991). This is known as the "automobile exception" to the general warrant requirement of the Fourth Amendment to the United States Constitution. Probable cause exists where the totality of the circumstances demonstrates "a fair probability that contraband or evidence of a crime will be found in a particular place". Illinois v. Gates, 462 U.S. 213, 238 (1983).

If either the initial stop or subsequent search of the vehicle is unlawful, any evidence seized as a result thereof must be suppressed unless some exception to the exclusionary rule applies. See United States v. Camacho, 661 F.3d 718, 728-29 (1st Cir. 2011).

D.   **Application**

The initial investigative stop and the eventual search of Dzabiev's vehicle were proper.

Investigators observed Dzabiev drive way above the speed limit in Maine on I-95. At that time, they were free to stop Dzabiev "even if the stop [was] just an excuse to investigate something else." McGregor, 650 F.3d at 820.

Investigators separately had a particularized and objective basis for suspecting Dzabiev was involved in drug trafficking activity.  Investigators intercepted communications between Alkayisi and Dzabiev that led them to believe Dzabiev was a customer of Alkayisi's and witnessed Dzabiev accept a package from Alkayisi during a possible narcotics transaction.  This, too, justified an investigatory stop.

While police officers cannot prolong a stop intended to address a traffic violation to conduct a K-9 sniff, Rodriguez v. United States, 575 U.S. 348, 357 (2015), they may extend a stop if they have reasonable suspicion of other criminal wrongdoing. Cruz-Rivera, 14 F.4th at 43; see Rodriguez, 575 U.S. at 355 (officers cannot prolong stop absent additional reasonable suspicion).  As noted above, Maine State Police had reasonable suspicion to believe criminal activity was afoot.

-14-

The Maine State Police officers who conducted the stop were not involved in the preceding investigation and did not witness Dzabiev commit the traffic offense but knowledge can be imputed to those officers acting "in accordance with the direction of another who has reasonable suspicion." Barnes, 506 F.3d at 63. Here, Maine State Police worked in conjunction with law enforcement officers who were familiar with the narcotics investigation.

Three minutes into the investigatory stop, the K-9 indicated the presence of narcotics in the vehicle. Even if only reasonable suspicion existed at that point, the length of this detention was reasonable. See United States v. Favreau, 886 F.3d 27, 30-31 (1st Cir. 2018) (finding "no serious question" that length of detention was reasonable under Terry where K-9 sniff extended search by three minutes). By the time the K-9 detected narcotics, there is no doubt that reasonable suspicion had ripened into probable cause. The subsequent search of the vehicle was then constitutionally permissible under the automobile exception. See Acevedo, 500 U.S. at 580.

Dzabiev complains that the initial traffic stop was not supported by probable cause but he would have the Court apply the wrong standard. Reasonable suspicion, not probable cause, is all that is required to commence an investigatory stop.

Pontoo, 666 F.3d at 27. Furthermore, law enforcement may use a traffic violation as a pretext to conduct an investigatory stop when it has reasonable suspicion that criminal activity is afoot. McGregor, 650 F.3d at 820.

Dzabiev also questions law enforcement's decision to wait until Dzabiev entered Maine to pull him over but acknowledges that "the timing of [a search] is a matter that the Constitution almost invariably leaves to police discretion." United States v. Winchenbach, 197 F.3d 548, 554 (1st Cir. 1999).  It is not the role of this Court to question the timing of the stop.  The officers had reasonable suspicion to conduct the stop when they did.

Accordingly, Dzabiev's motion to suppress will be denied without a hearing.

## III. O'Hearn Motion to Suppress Evidence Pursuant to Search Warrant

### A. Factual Background

On July 7, 2021, Special Agent Classon applied for a warrant to search Patrick O'Hearn's condominium in Braintree, Massachusetts.

In support of the application, Special Agent Classon filed a 38-page sworn affidavit ("the Classon Affidavit") that, among other things, described how law enforcement identified O'Hearn

as a possible criminal associate of Alkayisi, and why law
enforcement believed there was a fair probability that evidence
of drug trafficking and money laundering would be found at
O'Hearn's residence.

The Classon Affidavit provides support for the notion that
O'Hearn was a customer of Alkayisi, based on Alkayisi's visits
to O'Hearn's residence, the more than $25,000 in cash transfers
sent from Alkayisi to O'Hearn between May and July 2021 and
references to "Patrick" in "Braintree" in intercepted
communications.

The affidavit also proffers facts to support the notion
that Alkayisi stored methamphetamine at O'Hearn's residence. In
one intercepted communication, Alkayisi told an associate that
"James is needing eight," but that he would "save" him a "trip"
to "Braintree" by diverting him to an empty barn.  Investigators
surmised that Alkayisi was asking the associate to deliver eight
pounds of methamphetamine to Holyoke and understood "Braintree"
to be a reference to O'Hearn's residence.  Special Agent Classon
found further support the next day after agents observed
Alkayisi enter O'Hearn's residence with a black briefcase and
leave with a larger bag that appeared to be a "side cooler".

The Classon Affidavit also notes that Alkayisi used
O'Hearn's address as the principal place of business for his

-17-

shell company, ALKC LLC.  Given a lack of evidence of any
legitimate business activity following a review of bank
accounts, the affidavit suggests Alkayisi used the shell company
as a front to launder money and chose the address to elude law
enforcement detection.

After reviewing the Classon Affidavit, Magistrate Judge
Judith G. Dein authorized the search warrant on July 7, 2021,
the same day the affidavit was filed.  Early in the morning on
July 8, 2021, federal agents executed the warrant and searched
O'Hearn's residence.  They retrieved over 600 grams of pure
methamphetamine, as well as ketamine, cocaine, GHB,
hallucinogenic mushrooms and MDMA tablets.

**B. Motion to Suppress**

In support of his motion to suppress evidence obtained
pursuant to the search of his residence, O'Hearn asserts that
the search was not supported by probable cause.  Specifically,
he contends that 1) the Classon Affidavit lacks sufficient
reliable information to support a finding of probable cause, and
2) the evidence relied upon in the affidavit was too stale to
support a finding of probable cause.  O'Hearn requests an
evidentiary hearing on his motion.

**C. Legal Standard**

When assessing an affidavit, courts must consider

> whether the 'totality of the circumstances' stated in
> the affidavit demonstrates probable cause to search
> either the premises or the person.

United States v. Khounsavanh, 113 F.3d 279, 283 (1st Cir.
1997) (Gates, 462 U.S. at 238).

"[P]robable cause does not require scientific certainty."

United States v. Chiaradio, 684 F.3d 265, 279 (1st Cir. 2012)

(citation and internal quotation marks omitted).  Instead, a

magistrate must make

> a practical, common-sense decision [that there is a]
> fair probability that contraband or evidence of a
> crime will be found in a particular place.

Gates, 462 U.S. at 238.  A magistrate judge's determination is

entitled to deference and should only be reversed if there is

"no substantial basis for concluding that probable cause

existed." United States v. Dixon, 787 F.3d 55, 58-59 (1st Cir.

2015) (internal citation omitted).

A sworn affidavit filed in support of a search warrant is

entitled to a presumption of validity. See United States v.

Rigaud, 684 F.3d 169, 173 (1st Cir. 2012).  "The affidavit is to

be interpreted in a common-sense rather than a hypothetical or

hypertechnical manner." United States v. Garcia, 983 F.2d 1160,

1167 (1st Cir. 1993) (citing Gates, 462 U.S. at 236). When

reviewing a challenge to an affidavit, courts frequently

recognize that an officer's training and expertise can itself

support a probable cause determination. <u>United States</u> v. <u>Floyd</u>, 740 F.3d 22, 35 (1st Cir. 2014).

When evaluating a claim of staleness, courts in the First Circuit Court of Appeals "do not measure the timeliness of information simply by counting the number of days that have elapsed." <u>United States</u> v. <u>Morales-Aldahondo</u>, 524 F.3d 115, 119 (1st Cir. 2008) (internal citation omitted). To the contrary, "[c]ourts sometimes have upheld probable cause determinations based on yearsold information." <u>Floyd</u>, 740 at 33; <u>see also</u> <u>United States</u> v. <u>Procopio</u>, 88 F.3d 21, 26 (1st Cir. 1996) (information supporting warrant not stale despite crime occurring 14 months before).  Instead, courts

> must assess the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information.

<u>Morales-Aldahondo</u>, 524 F.3d at 119.

In addition, when an affidavit identifies continuous conduct, time becomes less important. <u>See</u> <u>United States</u> v. <u>Desousa</u>, 2021 WL 5811718, at *2 (D. Mass. Dec. 7, 2021).

Even if a warrant is deficient, the good faith exception applies

> when government agents rely on a warrant in objective good faith and in the interest of justice suppression is generally inappropriate.

United States v. Woodbury, 511 F.3d 93, 99 (1st Cir. 2007)

(citing United States v. Leon, 468 U.S. 897 (1984)).

**D. Application**

    **i.  Reliance on Affidavit**

Given the totality of circumstances, the magistrate judge did not err in finding the affidavit demonstrated that probable cause existed to search O'Hearn's residence.

Over the course of 38 pages, the Classon Affidavit details a multi-month investigation that repeatedly links O'Hearn and his residence to Alkayisi's drug trafficking and money laundering activities.  Among other things, officers observed Alkayisi visit O'Hearn's apartment complex during multiple trips that they had reason to believe were drug deliveries, identified more than $25,000 in payments from O'Hearn to Alkayisi in a short time span and learned Alkayisi listed O'Hearn's residence as the address for an inactive shell company presumably used to launder money.

O'Hearn responds that the affidavit does not provide evidence that O'Hearn and Alkayisi were ever together, and notes that there are many reasons why an individual might transfer such a large amount of money.  Essentially, O'Hearn asks this Court to assess each fact in isolation and to focus on what the Classon Affidavit does not address.

-21-

This misunderstands the probable cause inquiry. "The task of the issuing magistrate [was] simply to make a practical, common-sense decision" regarding whether there was a fair probability that contraband or evidence of a crime would be found at O'Hearn's residence. Gates, 462 U.S. at 238. The magistrate judge did not err in concluding that there was a reasonable probability that O'Hearn was involved in criminal activity or that evidence related to that activity would be found at O'Hearn's residence. There is no need for an evidentiary hearing on this issue.

### ii. Staleness

The evidence relied upon in the Classon Affidavit also was not stale. O'Hearn complains that the warrant application was not submitted until 38 days after discovery of evidence connecting his residence to the criminal conduct, i.e. when agents saw Alkayisi leave his residence with what they believed to be a soft-sided cooler on May 20, 2021.

Given that courts in the First Circuit sometimes have upheld probable cause determinations based on years-old information, Floyd, 740 at 33, a 38-day delay is perfectly reasonable. This is especially true here given the continuing pattern of criminal activity identified in the Classon Affidavit. Desousa, 2021 WL 5811718, at *2. But the May 20,

2021 surveillance was not the only evidence of O'Hearn's criminal conduct.  As the government observes, the Classon Affidavit describes a money transfer believed to be for narcotics on July 1, 2021, just one week before the issuance of the warrant.

### iii.  Good Faith Exception

Given that the Court has found the warrant was supported by probable cause, it declines to address the good faith exception.

## IV. O'Hearn Motion to Suppress Statements

### A. Facts

Early in the morning on July 8, 2021, investigators executed the July 7 search warrant and searched O'Hearn's residence in Braintree, Massachusetts.  During the search, they found financial documents, including deposit receipts that indicated O'Hearn held an account at TD Bank.  The government maintains that after O'Hearn received multiple Miranda warnings and signed a written waiver of rights, he spoke with the investigators and provided them with the combinations for two safes.

When investigators opened one of the safes using the combination O'Hearn furnished, they found several safe deposit box keys.  In a subsequent interview, O'Hearn told investigators

that one of the keys would open a safe deposit box at TD Bank but identified the wrong bank branch.

Investigators eventually used financial documents found in O'Hearn's residence to cause grand jury subpoenas to be issued to the implicated financial institutions.  As a result of those subpoenas, investigators determined O'Hearn possessed a safe deposit box at a TD Bank branch in Hingham, Massachusetts.  At trial, the government intends to introduce evidence obtained from an executed search warrant on that safe deposit box.

**B. Motion to Suppress**

O'Hearn claims that during his questioning at his residence on July 8, 2021, investigators failed to advise him of his Miranda rights and that he did not make a knowing and intelligent waiver.  O'Hearn insists he was under the influence of narcotics at the time of his interrogation, "in an altered state and extremely overwrought."  He denies that there is a signed waiver of rights form and complains that the federal agents "purposely skimmed" over his Miranda warnings.

O'Hearn accordingly submits that his Fifth, Sixth, and Fourteenth Amendment rights were violated and that the custodial interrogation was improper under Miranda v. Arizona, 348 U.S. 436 (1966).  O'Hearn requests an evidentiary hearing on the motion.

-24-

**C. Legal Standard**

A waiver of one's <u>Miranda</u> rights must be made "voluntarily, knowingly and intelligently." <u>Miranda</u>, 348 U.S. at 444. A waiver is voluntary when "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." <u>Moran</u> v. <u>Burbine</u>, 475 U.S. 412, 421 (1986). A knowing and intelligent waiver requires "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>Id.</u> Both inquiries are based on the totality of circumstances surrounding the investigation. <u>Id.</u>

"[T]he [government] need prove waiver only by a preponderance of the evidence." <u>Colorado</u> v. <u>Connelly</u>, 479 U.S. 157, 168 (1986). While an individual's intoxication is a relevant consideration,

> [i]n the context of the voluntariness of a confession, a defendant's mental state by itself and apart from its relation to official coercion never disposes of the inquiry into constitutional voluntariness.

<u>United States</u> v. <u>Palmer</u>, 203 F.3d 55, 61-62 (1st Cir. 2000); <u>see</u> <u>United States</u> v. <u>Diaz-Rosado</u>, 857 F.3d 116, 123 (1st Cir. 2017) (rejecting argument that confession was not voluntary due to "drug-addled state" because "a finding

-25-

that a confession is not 'voluntary' requires a finding of coercive police activity").

Even if evidence would otherwise be excluded, under the inevitable discovery exception to the exclusionary rule,

> [i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received.

Nix v. Williams, 467 U.S. 431, 444 (1984).

> The inevitably discovery exception applies

> so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994) (citations omitted).

### D. Application

The government contends that O'Hearn was given Miranda warnings several times and knowingly and voluntarily waived his Miranda rights verbally and in writing.  It cites an advice of rights form that O'Hearn signed on the morning of July 8, 2021, and that the government previously submitted as an exhibit as well as a recording of O'Hearn's questioning that it claims demonstrates that O'Hearn was cogent.  The government further avers that, even if O'Hearn's statements are not admissible,

-26-

evidence obtained from O'Hearn's safe deposit box should be admitted under the inevitable discovery exception to the exclusionary rule.

The government easily establishes that O'Hearn voluntarily and knowingly waived his <u>Miranda</u> rights by a preponderance of the evidence.  It submitted a copy of an advice of rights form that O'Hearn signed during the execution of the search warrant.[2] Investigators also attest that O'Hearn verbally waived his rights more than once and offer a recording of his questioning. O'Hearn informed law enforcement officers that he was willing to speak with them.

In his motion, O'Hearn does not suggest that his statements were the result of coercion and there is nothing in the record to suggest the investigators were anything but professional.  He instead argues that his statements should not be admissible because he was "clearly frightened" and "under the influence of narcotics."  His mental state alone cannot, however, render his statements involuntary. <u>See</u> <u>Palmer</u>, 203 F.3d at 61-62.  The investigators found O'Hearn to be coherent throughout his interview, <u>see</u> <u>United States</u> v. <u>Rojas-Tapia</u>, 446 F.3d 1, 8 (1st Cir. 2006), and the record supports that assessment.  O'Hearn

---

[2] O'Hearn's claim that "[t]here appears to be no written waiver of rights form signed by Mr. O'Hearn" is directly contradicted by the government's submission. Docket No. 326-2.

-27-

volunteered to speak, signed a waiver form, and provided the correct combinations for the two safes in his residence.  There is no reason to believe O'Hearn was so mentally impaired that he could not appreciate the nature of the interrogation.

Even if O'Hearn's waiver of his <u>Miranda</u> rights was not sufficient, the government has established by a preponderance of the evidence that the evidence found in O'Hearn's safe deposit box "inevitably would have been discovered by lawful means." <u>Nix</u>, 467 U.S. at 444.

The investigators found financial records in O'Hearn's residence while executing the search warrant that suggested he maintained an account at TD Bank.  The government submits that if O'Hearn had not provided the combinations for the safes, investigators would have forcefully opened the safes and seized the keys therein during the execution of the search warrant.  A commonsense review of the facts supports this contention.  By the time investigators questioned O'Hearn, they knew about the safe.  Given the nature of the investigation, it was likely that the safe would contain relevant information.  And the fact that a safe is locked does not shield it from a search warrant. <u>United States</u> v. <u>Owens</u>, 2017 WL 151385, at *2 (D. Mass. Jan. 13, 2017) (noting "[t]here is no exception for locked containers").

The government notes that it is common practice, after encountering financial records, to seek a grand jury subpoena that requires implicated financial institutions to provide additional records related to any identified accounts.  It is reasonable to assume that once the search warrant unearthed the financial documents, the government would follow its standard procedure that led to the discovery of the TD Bank safe deposit.  See Zapata, 18 F.3d at 978 (discovery was inevitable where investigators completed inventory search "in accordance with standard practice").

O'Hearn's motion to suppress will be denied.  This Court is satisfied that O'Hearn knowingly and voluntarily waived his Miranda rights.  Even without his waiver, the inevitable discovery exception to the exclusionary rule would apply.

**ORDER**

For the foregoing reasons, defendant Alkayisi's motion to suppress (Docket No. 302), defendant Dzabiev's motion to suppress (Docket No. 294), defendant O'Hearn's motion to suppress evidence (Docket No. 295) and defendant O'Hearn's motion to suppress statements (Docket No. 298) are all **DENIED**, without hearings.


**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge


Dated October 30, 2023

-30-