UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 21-10208-NMGss |
| | ) | |
| (1)    RESHAT ALKAYISI, | ) | |
| Defendant | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through Assistant United States Attorney Alathea E. Porter, hereby respectfully submits this sentencing memorandum in connection with the sentencing of defendant Reshat Alkayisi (hereinafter, the "Defendant").  On April 2, 2024, the Defendant pled guilty to Counts One through Five of a six-count Second Superseding Indictment, charging Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. § 846 (Count One), Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Count Two), Money Laundering Conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Three), and Money Laundering, in violation of 18 U.S.C. § 1956 (Counts Four and Five).[1]

At the time of his arrest in July 2021, the Defendant was the largest methamphetamine distributor in New England.  Methamphetamine is a highly addictive, deadly, dangerous, and devastating drug that destroys lives.  The Defendant sold methamphetamine in huge quantities, not to support his own addiction, but to profit off of the pain and suffering of others.  In furtherance of his drug trafficking, the Defendant unlawfully possessed dangerous firearms, including an AK-47 semi-automatic rifle, a Glock 9mm handgun with no serial number, and over 4,200 rounds of ammunition for those firearms.  And in an effort to conceal his drug trafficking, the Defendant

---

[1] The Defendant was not charged in Count Six of the Second Superseding Indictment.

laundered his drug proceeds. Not only did he engage in this atrocious conduct, but he pulled others into his criminal enterprise, including his wife, Christina Lua, who now stands as a convicted felon.

After careful consideration, the government recommends that the Court sentence the Defendant to 360 months of imprisonment,[2] followed by 60 months of supervised release, $500 in mandatory special assessments, and forfeiture as alleged in the Second Superseding Indictment. For the reasons set forth herein, and as will be presented at the sentencing hearing, the Defendant deserves every day of the government's proposed sentence of thirty years of prison.

## **Factual Background**

The background of the case is set forth in detail in the final Pre-Sentence Report ("PSR"), prepared by the United States Probation Office ("Probation"), and is therefore not fully restated herein. PSR, ¶¶ 10-108. This case involves a conspiracy among large-scale methamphetamine distributors in the New England area. *Id*. The Defendant was at the head of that drug trafficking organization ("DTO"). The investigation began when a cooperating witness ("CW") provided investigators with information about James Holyoke ("Holyoke"), a large-scale methamphetamine distributor. PSR, ¶ 10. After completing a number of controlled purchases from Holyoke, investigators identified the Defendant as Holyoke's methamphetamine supplier. PSR, ¶ 11.

The CW participated in twelve successful controlled purchases of methamphetamine from the DTO. *Id*. Eleven of the controlled purchases were arranged by Holyoke, and he personally delivered the methamphetamine for eight of those eleven deals. *Id*. One of the controlled purchases was arranged by Holyoke, but delivered by Holyoke's associate Edison Klotz. *Id*. Two

---

[2] This sentencing recommendation breaks down as follows: 300 months as to Count One; 60 months as to Count Two, to run consecutive to Count One (as required by statute); and 240 months as to Counts Three, Four, and Five (the statutory maximum as to those counts), to run concurrent to Count One.

of the other controlled purchases were arranged by Holyoke, but delivered by the Defendant. *Id.* Additionally, the Defendant arranged one controlled purchase with the CW, but had his worker Brian Keleman ("Keleman") deliver the methamphetamine to the CW. *Id.* The details of those controlled purchases are set forth in paragraphs 13-25 of the PSR.

Beginning in May 2021, pursuant to Title III wiretap orders, investigators intercepted communications to and from the Defendant's telephone for a total of sixty days. PSR, ¶ 34. In addition to his methamphetamine trafficking, the interceptions revealed that the Defendant also operated a large-scale illegal marijuana grow operation at his residence in Rhode Island, despite the fact that the Defendant was on probation for a Rhode Island state conviction related to unlawful marijuana distribution. PSR, ¶¶ 35, 87, 132.

The investigation revealed that the Defendant supplied multiple distributor customers with supplier quantities of pure methamphetamine. PSR, ¶¶ 12, 26-33, 37-45, 53-78, 96. Those distributor customers included Holyoke, Robyn Costa ("Costa"), Eric Daneault ("Daneault"), Andre Watson ("Watson"), Emil Dzabiev ("Dzabiev"), and Patrick O'Hearn ("O'Hearn"). *Id.*

Over the course of the sixty days of interceptions, the Defendant bragged to his distributors about the quality of his pure methamphetamine. For example, the Defendant told Daneault, "You're gonna get nice, big crystals," meaning that the Defendant supplied a high quality of methamphetamine. PSR, ¶ 43. On another occasion the Defendant told Daneault that his customers would be happy with the Defendant's methamphetamine, stating, "Ur contacts should b happy with the size of product." PSR, ¶ 54. During one text message exchange, the Defendant told Daneault:

> **DEFENDANT**:        Do u want 2 know how pure my product is?
>
> DANEAULT:        I sure do?

**DEFENDANT**:      A scorpion from south of the border trapped inside a crystal.

DANEAULT:      Oh shit that's messed up lol he didn't make it I c [sic]

DANEAULT:      Or he got way 2 high 🤣 🤣

DANEAULT:      Yeah no thank you you could make that your brand name and logo Scorpion the product so pure you feel like you have been stung…

PSR, ¶ 94. When the Defendant first began distributing to new distributor customer Andre Watson, the Defendant justified the high price he charged for his methamphetamine, saying, "mine is 100%," meaning that his methamphetamine was 100% pure. PSR, ¶ 56. Indeed, over the course of the investigation, investigators seized over 60 kilograms of 100% pure methamphetamine from the Defendant, and over 3.6 kilograms of 74-99% pure methamphetamine. PSR, ¶ 95.

The Defendant did not just sell large quantities of methamphetamine; he followed up with his distributors about how they were doing with their "sales," as he had a vested interest in how much methamphetamine they sold and for what prices. PSR, ¶¶ 37-40, 54. The Defendant even paid the bail of two of his distributors so that they could continue distributing methamphetamine on his behalf. PSR, ¶¶ 26-28; Counts Four and Five. And when it became clear that one of those distributors (Costa) was not paying him, the Defendant cut Costa out and began distributing directly to Costa's customers who the Defendant expected would take over Costa's methamphetamine sales. PSR, ¶¶ 37-42.

The Defendant made sure to keep his distributors in supply of methamphetamine so that they could keep on selling, even when he went out of town. During the sixty days of interceptions, the Defendant regularly traveled outside of New England to California and Las Vegas, Nevada, and just prior to leaving on those trips, as well as upon his return, the Defendant made arrangements to supply his distributors with methamphetamine. *Id*. For example, on May 12,

2021, just prior to leaving on a trip the Defendant supplied Daneault with 4 pounds (or 1.8 kilograms) of methamphetamine, then met with two other methamphetamine customers. PSR, ¶¶ 41-45. The Defendant set up meetings to distribute methamphetamine upon his return to Boston. On May 20, 2021, the Defendant distributed 3 pounds (or 1.3 kilograms) of methamphetamine to Daneault, 2 pounds (or over 900 grams) of methamphetamine to Watson, and 1 pound (or 455 grams) of methamphetamine to Dzabiev. PSR, ¶¶ 53, 55-68. Investigators surveilled each of these meetings and stopped Dzabiev after his meeting with the Defendant. *Id.* During the stop of Dzabiev, investigators seized 455 grams of 100% pure methamphetamine. PSR, ¶ 62. Similarly, just prior to leaving on another trip, on May 23, 2021, the Defendant distributed additional methamphetamine to Watson. PSR, ¶¶ 69-72.

While traveling or otherwise unavailable, the Defendant also directed Keleman to deliver methamphetamine on his behalf to his distributor customers, including to Holyoke. PSR, ¶¶ 35, 73-79. On May 6, 19, 29, 31, and June 1, 2021, the Defendant directed Keleman to deliver methamphetamine to Holyoke. PSR, ¶¶ 73-79. On May 19, 2021, the Defendant directed Keleman where to retrieve the methamphetamine from the Defendant's property, directed Keleman to get 8 pounds (or 3.6 kilograms) of methamphetamine and to put it in two bags, and directed Keleman where to meet with Holyoke to complete the deal. PSR, ¶¶ 73-75. Similarly on May 29, 2021, at the direction of the Defendant, Keleman delivered additional methamphetamine to Holyoke. PSR, ¶ 76. And on May 31, 2021, Keleman delivered an additional 10 pounds (or 4.5 kilograms) of methamphetamine to Holyoke at the direction of the Defendant. PSR, ¶¶ 77-78.

On June 1, 2021, the day after the Defendant directed Keleman to deliver 10 pounds of methamphetamine to Holyoke, he contacted Keleman again to direct him to deliver yet *another* 8 pounds (or 3.6 kilograms) of methamphetamine to Holyoke. PSR, ¶ 79. The Defendant had just

received a large shipment of methamphetamine and he directed Keleman to pick up the packages containing the methamphetamine so that Keleman could supply Holyoke.  *Id.*  He told Keleman, "Will you have time to go to the P.O. box in Cumberland for me? … Because, um, James is gonna need another 8," meaning another eight pounds of methamphetamine.  *Id.*

Thereafter, investigators observed Keleman retrieve four boxes from a UPS store and put them in his car.  PSR, ¶ 80.  Once in the car, Keleman called the Defendant and said, "Hey, all four of the boxes were Chewy boxes," and the Defendant responded, "Yeah, I know… Th-that's how they send it… That's their disguise," and went on to say that "they" also sometimes "send it in the Amazon box," meaning that the Defendant's suppliers disguised the methamphetamine by shipping it in boxes that appeared to be from a legitimate source.  *Id.*  The two then discussed what Keleman should deliver to Holyoke.  *Id.*  The Defendant told Keleman that some of his product was in "big blocks" and other was "loose stuff," and he directed Keleman to "open up the package… if you see any big blocks, just put it on the side, and then use the loose stuff to give it to him."  *Id.*

Investigators followed Keleman and conducted a motor vehicle stop, during which they seized the four boxes, which contained over 97 pounds (or 44.226 kilograms) of 100% pure methamphetamine.  PSR, ¶ 81.  The boxes were addressed to the Defendant's shell corporation (ALKC Corp) that he used to launder his drug proceeds.  PSR, ¶ 100.  Photographs from the seizure are attached hereto as Exhibit 1.

Following the stop and seizure from Keleman, the Defendant called other associates to assist him in hiding his firearms and ammunition because he feared that the police would raid his property and he knew he was not allowed to have guns and ammunition.  PSR, ¶¶ 82-87.  Specifically, the Defendant asked one individual to "grab some stuff out of there, out of the farm,

and put it, um, in the farm somewhere where it – it's not gonna be seen... there's AK-47 and ammunition stuff… over by this, um, small, small barn." PSR, ¶ 83. The Defendant also asked this person to get his "handgun." *Id*. In subsequent calls, the Defendant directed this individual where to find the AK-47 and "boxes with the bullets." PSR, ¶ 86. The individual confirmed and also noted there was a "bin with dry ice in it," meaning methamphetamine. *Id*. The Defendant directed this person to go hide the items in the "chicken coop." *Id*.

Less than one month later, on June 25, 2021, investigators intercepted communications about another package that the Defendant was expecting that contained methamphetamine. PSR, ¶ 92. Investigators seized that package and it contained approximately 30 pounds (or over 13.3 kilograms) of pure methamphetamine. *Id*. A photograph of the methamphetamine seized from that package is attached as Exhibit 2.

The Defendant typically charged his distributor customers $5,000 to $6,000 per pound of methamphetamine. PSR, ¶¶ 22, 31, 41, 56, 96. In order to conceal the nature of these proceeds, the Defendant utilized multiple methods to launder his drug proceeds, including paying the bail of his distributors, sending bulk cash payments via the mail to his supplier, structuring cash deposits to avoid reporting requirements, getting paid via peer-to-peer transfers, and purchasing vehicles with cash. PSR, ¶¶ 97-99, 101-108. The Defendant also created and utilized a shell company to launder his drug proceeds. PSR, ¶ 100. In addition, the Defendant recruited and directed others to launder his drug proceeds for him, including his wife Christina Lua and his worker Keleman. PSR, ¶¶ 106-108.

On July 8, 2021, investigators executed a series of search warrants in connection with the indictment in this case, including at the Defendant's Rhode Island property. PSR, ¶¶ 87, 96. During that search, investigators located an AK-47 semi-automatic rifle, a Glock 9mm handgun

with no serial number, and over 4,200 rounds of ammunition.  PSR, ¶ 87.  The items were in bins, just as the Defendant had described, and they were in the exact location (the "chicken coop") that the Defendant directed his associate to hide them following Keleman's arrest.  *Id.*  Additionally, investigators located a large unlawful marijuana grow operation that had hundreds of marijuana plants, as well as marijuana in all the stages of production for distribution.  Photographs from the search of the Defendant's property are attached as Exhibit 3.

During the search, investigators also located and seized a computer that had saved on it an Excel spreadsheet that appears to be a drug ledger tracking the Defendant's distribution of methamphetamine and amounts paid and owed to him for the months of January 2021 through the first week of July 2021.  PSR, ¶ 96.  The ledger contains multiple tabs, one for each month of 2021.[3]  *Id.*  Each tab lists the "client" by first name, then has a column for each week, then lists a "total" and a "balance" for each client.  *Id.*  The ledger indicates that the Defendant charged $6,000 per pound of methamphetamine, which is consistent with what the Defendant charged the CW during the controlled purchases, and it is also consistent with discussions of price that investigators intercepted.  *Id.*  Some of the clients listed in the ledger are "James" (Holyoke), "Robin" (Costa), "Eric" (Daneault), "Emil" (Dzabiev), "Dre" (Watson), and "Patrick" (O'Hearn).  *Id.*  The ledger entries are also consistent with the methamphetamine deals described in the PSR.  *Id.*  According to the ledger, between January and the first week of July 2021, the Defendant sold over $2.388 million in methamphetamine.  *Id.*  If he were charging $6,000 per pound, that would equate to 398 pounds or over 180 kilograms of methamphetamine.  *Id.*

---

[3] The ledger only has data into June, but has a tab for each month of the year.  The Defendant was arrested and has been in custody since July 8, 2021.

**Sentencing Guidelines**

The final PSR determined that the Defendant's total offense level is 41.  PSR, ¶ 124.  The Defendant's base offense level is 38, which is the highest base offense level for controlled substance offenses, because he is responsible for over 4.5 kilograms of methamphetamine (actual). PSR, ¶ 115.  The seizures in this case, all of which the Defendant is responsible for, total over 64 kilograms of pure methamphetamine, which is over fourteen times the threshold amount that establishes his base offense level.  PSR, ¶ 95; *see* USSG § 2D1.1(c)(1).  The ledger seized from the Defendant indicates that the Defendant is actually responsible for over 398 pounds (or over 180 kilograms) of methamphetamine over the course of just six months, and that doesn't account for the additional 130 pounds seized from packages in June 2021.  PSR, ¶¶ 81, 96.  In other words, if the Court were to use the ledger to account for his sales, plus the package seizures, to determine the amount of methamphetamine attributable to the Defendant, he would be responsible for over 528 pounds (or over 239 kilograms) of methamphetamine in a six month period of time.  That is over 53 times the threshold amount that establishes this base offense level.  *See* USSG § 2D1.1(c)(1).

Pursuant to USSG § 2D1.1(b)(12), Probation increased the Defendant's offense level by 2 because the Defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance.  PSR, ¶ 116.  Probation further increased the Defendant's offense level by 4, pursuant to USSG § 3B1.1(a), because the Defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive.  PSR, ¶ 118.  Probation then reduced the Defendant's offense level by 3 levels, pursuant to USSG § 3E1.1(a) and § 3E1.1(b).

Probation determined that the Defendant has three criminal history points, which places

him in criminal history category II.  Based on a criminal history category II, and with a total offense level of 41, the advisory sentencing guideline range is 360 months to life with respect to Count One; it is 240 months with respect to Counts Three through Five (the statutory maximum); and the Court is required to impose a term of 60 months consecutive to the sentence imposed for Count One with respect to Count Two.  PSR, ¶ 174.  The government agrees with these calculations.

The Defendant, however, takes issue with Probation's calculations.  First, without any explanation as to why, the Defendant objected to the role enhancement.  PSR, Objection #9.  That objection is without merit.   To qualify for that enhancement, a defendant must be "a leader or organizer of criminal activity that involved five or more participants *or* was otherwise extensive." USSG § 3B1.1(a) (emphasis added).  As Probation stated in its response to that objection, the Defendant directed and exercised control over other indicted and unindicted co-conspirators, including Keleman, Lua, and two unindicted co-conspirators, and he directed and/or managed the criminal conduct of Costa, Watson, and O'Hearn.   The Defendant also organized deliveries of methamphetamine to his methamphetamine distributor customers, and he organized the shipment of methamphetamine.   The original indictment charged eleven individuals, and included allegations related to additional unindicted co-conspirators, so clearly the criminal activity involved more than five people.  Even if the criminal activity did not involve five or more participants, which it absolutely did, it goes without saying that the criminal activity was otherwise extensive.  The Defendant distributed massive amounts of methamphetamine throughout New England.    Though he resided in Rhode Island, he distributed supplier quantities of methamphetamine in Massachusetts, New Hampshire, and Maine.  Additionally, the Defendant utilized suppliers in California to ship methamphetamine from the west coast to New England.

The scale of the operation, the amount distributed, and the breadth of the conspiracy certainly qualifies as "otherwise extensive."

The Defendant also claims that he should receive the "zero-point offender" 2-level reduction pursuant to USSG § 4C1.1. That objection is perplexing since the Defendant is disqualified from that reduction in *three* separate ways. First, there is no question that the Defendant has three criminal history points due to a prior felony drug trafficking conviction. PSR, ¶ 132; USSG § 4C1.1(a)(1). Second, he is ineligible for the reduction because he received an aggravating role enhancement (USSG § 4C1.1(a)(10)), and third, he is ineligible because he pled guilty to possessing a firearm in furtherance of a drug trafficking offense (USSG § 4C1.1(7)).

The Court should overrule all of the Defendant's objections and adopt the advisory guideline calculation as set forth in the PSR.

## Consideration of the Section 3553(a) Factors

Taking into account the Defendant's role in the offense, his personal history and characteristics, as well as the nature of the offense, and considering the factors set forth in 18 U.S.C. § 3553(a), the Government respectfully suggests that a sentence of 360 months is sufficient, but not greater than necessary, to comply with the purposes of set forth in 18 U.S.C. § 3553(a).

### 1. Nature of the Offense

The Defendant was the leader of a DTO responsible for distributing massive amounts of methamphetamine throughout the New England area. Methamphetamine is a deadly and highly addictive drug that is an increasingly serious problem throughout the United States and in the District of Massachusetts.[4] The proportion of federal drug trafficking cases involving

---

[4] Martha Bebinger, *"Meth Use Is Rising In Boston, Intensifying The Opioid Crisis,"* appearing at https://www.wbur.org/news/2018/11/21/meth-worsening-opioid-epidemic (last accessed June 24, 2024).

methamphetamine has steadily increased over the past 20 years, accounting for 48.7% of all drug trafficking cases in 2022, and becoming the predominant drug trafficked over the last decade.[5] Abuse of this potent stimulant is plaguing many parts of the country, and the government has seen a significant rise in the amount of methamphetamine in the District of Massachusetts over the course of the last three years.

Recent national reports have confirmed that methamphetamine abuse is increasing dramatically. The National Institute on Drug Abuse found that among people aged 12 or older in 2021, 0.9% (or about 2.5 million people) reported using methamphetamine within the prior 12 months.[6] And that reflects only those who *reported* use. Moreover, methamphetamine is one of the most commonly misused stimulant drugs in the world.[7] "The consequences of methamphetamine misuse are terrible for the individual—psychologically, medically, and socially. Using the drug can cause memory loss, aggression, psychotic behavior, damage to the cardiovascular system, malnutrition, and severe dental problems."[8] In addition to these horrific effects on individual health, "methamphetamine misuse threatens whole communities, causing new waves of crime, unemployment, child neglect or abuse, and other social ills."[9]

---

[5] United States Sentencing Commission, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System,* appearing at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2024/202406_Methamphetamine.pdf, at 16 (last viewed August 6, 2024) ("USSC 2024 Methamphetamine Trafficking Offenses").

[6] *See* NIDA. "Overview." *National Institute on Drug Abuse*, 24 Feb. 2023, https://nida.nih.gov/publications/research-reports/methamphetamine/overview (last accessed June 24, 2024).

[7] *Id.*

[8] *Id.*

[9] *Id.*

Among people aged 12 and older in 2020, an estimated 0.6% (or about 1.5 million people) had a methamphetamine use disorder in the prior 12 months.[10]   Methamphetamine is second only to fentanyl in causing drug-related deaths in the United States.[11]   In 2022, there were 33,355 methamphetamine-related deaths nationwide.[12]   Indeed, this crisis has worsened each year since 2015.[13]   The Centers for Disease Control and Prevention found that overdose deaths from psychostimulants, comprised mostly of methamphetamine, increased by 703% from 2011 to 2021.[14]   Moreover, the Drug Enforcement Administration found that 31% of drug-related deaths in the United States are caused by psychostimulants – mostly methamphetamine.[15]   As of June 2, 2024, there were at 34,595 methamphetamine-related deaths nationwide for the prior 12-month period.[16]

Equally devastating, as methamphetamine production has shifted from makeshift, local

---

[10]   *Id.*

[11]   Drug Enforcement Administration, *2024 National Drug Threat Assessment*, appearing at https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf, at 3 (last viewed August 6, 2024) ("DEA 2024 Assessment").

[12]   National Center for Health Statistics, *VSRR Provisional Drug Overdose Death Counts*, appearing at https://data.cdc.gov/d/xkb8-kh2a (hereinafter, "2022 VSRR Overdose Death Counts") (last accessed Dec. 9, 2023).

[13]   *Id.*

[14]   USSC 2024 Methamphetamine Trafficking Offenses, at 6.

[15]   DEA 2024 Assessment, at 6.

[16]   National Center for Health Statistics, *National Vital Statistics System, Provisional Drug Overdose Death Counts,* appearing at https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last accessed June 24, 2024) (hereinafter, "2024 VSRR Overdose Death Counts").

labs to sophisticated Mexican laboratories, methamphetamine production and purity have increased exponentially.[17]  Purity of methamphetamine has risen to nearly 100%.  Indeed, in this case, investigators seized over 60.8 kilograms of 100% pure methamphetamine.  As the New York Times has reported, this combination of increased production and increased purity has been particularly lethal: "There is more meth on the streets today, more people are using it, and more of them are dying."[18]

In recent years, methamphetamine has become much more prevalent in the Northeast.[19] Most of the methamphetamine supply is produced in Mexico and transported to the United States.[20] That is because methamphetamine produced in Mexico presents a lower cost, higher purity, and higher potency alternative.[21]  Due to its low costs of production and maintenance, combined with the expansion of Mexican drug cartels into major United States cities and their extensive drug distribution networks within local communities, methamphetamine remains in constant supply and

---

[17]  Frances Robles, "*Meth, the Forgotten Killer, is Back. And It's Everywhere*", The New York Times, February 13, 2018, appearing at https://www.nytimes.com/2018/02/13/us/meth-crystal-drug.html (hereinafter, "Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere*") (last accessed June 24, 2024).

[18]  Frances Robles, *Meth, the Forgotten Killer, is Back. And It's Everywhere.*

[19]  U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf, at 23 (last accessed June 24, 2024) (hereinafter, "DEA 2020 Assessment"); Streck, Joanna M et al., *Injection of Methamphetamine Has Increased in Boston, Massachusetts: 5 Waves of Centers for Disease Control and Prevention State Surveillance Data*, 17.3 J. OF ADDICTION MEDICINE 349–352 (2023) (last viewed July 12, 2023).

[20]  DEA 2024 Assessment, at 31.

[21]  *Id.*

is easily accessible.[22]   Purer, cheaper methamphetamine leads to more deaths.   The number of methamphetamine overdoses in Massachusetts alone increased threefold from 2018 to 2022 (growing from 70 deaths to 210).[23]   Between June 2023 and June 2024, there were 215 methamphetamine-related overdose deaths in Massachusetts.[24]   In fact, "[t]he rate of all drug-related E[mergency] D[epartment] visits was highe[r] among patients residing in the Northeast[ern United States] (2,531 per 100,000 [residents])" than any other region in the nation.[25]

Even when not lethal, the physical and emotional effects of methamphetamine abuse are dramatic.   Methamphetamine has a horrific impact on its users and on the community. Methamphetamine is a tremendously addictive drug, which can cause dramatic physical and emotional changes on those who use it, including increases in aggressive and violent behavior.[26] The physical effects on users are well-documented.   The emotional changes are equally devastating:

> Chronic abusers may exhibit symptoms that can include significant anxiety, confusion, insomnia, mood disturbances, and violent behavior.  They also may display a number of psychotic features,

---

[22]  *Id.* at 3 – 16.

[23]  2022 VSRR Overdose Death Counts.

[24]  2024 VSRR Overdose Death Counts.

[25] Substance Abuse and Mental Health Services Administration, PEP22-07-03-002, *Findings from Drug-Related Emergency Department Visits, 2021*, https://store.samhsa.gov/sites/default/files/pep22-07-03-002.pdf (2022), at 9 (last accessed June 24, 2024).

[26]  Mark A. R. Kleiman, Jonathan P. Caulkins, and Angela Hawken, *Drugs and Drug Policy: What Everyone Needs to Know* 120 (Oxford University Press 2011) ("There is . . . a much stronger association between violence and regular methamphetamine use.   Heavy use of methamphetamine increases the likelihood of attack behaviors and aggression, with the most compelling evidence coming from laboratory studies involving mice.").

> including paranoia, visual and auditory hallucinations, and
> delusions (for example, the sensation of insects creeping under the
> skin).  Psychotic symptoms can sometimes last for months or years
> after a person has quit abusing methamphetamine, and stress has
> been shown to precipitate spontaneous recurrence of
> methamphetamine psychosis in formerly psychotic
> methamphetamine abusers.[27]

And, unlike opioid addiction, there are no approved drugs available for treatment of

methamphetamine addiction.[28]  Addicted users who choose to stop using methamphetamine may

face withdrawal symptoms including severe depression, psychosis, and intense drug cravings.[29]

Even methamphetamine addicts who manage to overcome their addiction "will be at risk for

relapse for years and possibly for their whole lives."[30]

### 2.  Characteristics of the Defendant

The Defendant is a 63 year old man, who appears to be in good health.  PSR, ¶¶ 144, 154.

The Defendant has six prior criminal convictions, though five of the convictions are too old to

score.  PSR, ¶¶ 127-132.  The conviction that does score is a 2013 Rhode Island state conviction

for possession of marijuana with the intent to distribute (8 kilograms), for which he received a

---

[27]  National Institute on Drug Abuse, *What are the long-term effects of methamphetamine abuse,* April 7, 2017, appearing at https://www.drugabuse.gov/publications/research-reports/methamphetamine/what-are-long-term-effects-methamphetamine-abuse (last accessed June 24, 2024).

[28]  Carmen Heredia Rodriguez, *"Meth's Resurgence Spotlights Lack of Meds To Combat the Addiction,"* Kaiser Health News, January 14, 2019, appearing at https://khn.org/news/meths-resurgence-spotlights-lack-of-meds-to-combat-the-addiction/ (last viewed June 24, 2024).

[29]  National Institute on Drug Abuse, *Methamphetamine Drug Facts*, May 16, 2019, appearing at https://nida.nih.gov/publications/drugfacts/methamphetamine (last accessed June 24, 2024).

[30]  National Institute on Drug Abuse, *Understanding Drug Use and Addiction DrugFacts*, June 6, 2018, appearing at https://nida.nih.gov/publications/drugfacts/understanding-drug-use-addiction (last accessed June 24, 2024).

sentence of 10 years committed, 18 months to serve, and the balance suspended.  PSR, ¶ 127.  It is of note that the Defendant was on probation for that offense at the time he committed the instant offenses, which include conspiracy to distribute controlled substances and possession of firearms in furtherance of a drug trafficking offense.

The Defendant reported having a rough childhood, though that information has not been corroborated.  PSR, ¶¶ 145.  According to the Defendant, he attended boarding school in England, then the University of London, then the University of Madrid, then the University of San Francisco, then Sonoma State University, where he earned a bachelor's degree.  PSR, ¶ 159.  Despite this education, the Defendant did not maintain lawful employment for the last ten years prior to his arrest in this case.  PSR, ¶¶ 161-166.

In his sentencing memorandum, the Defendant claims to have a serious gambling addiction and he argues that his addiction led him to commit the offenses of conviction.  *See* Defendant's Sentencing Memorandum, Dkt. 691.  Other than the Defendant's self-serving statements, there is no evidence to support that argument.  The Defendant submitted records from casinos, which indicate that during the conspiracy period (17 months), he visited casinos on only seven occasions; four of those visits were sequential days that were all during the same trip that he took to Las Vegas at the end of May 2021.  The records provided by the Defendant indicate that he also visited the Wynn Las Vegas Casino on one additional day in May 2021, and that he visited the Mohegan Sun Casino in Connecticut one day in May 2021.  The remaining casino visit that occurred during the conspiracy period is a single day visit to the Foxwoods Casino in August 2020.  Over the course of those seven visits in a 17 month period of time, the Defendant lost a total of $7,750.  The records provided by the Defendant date back to 2012.  Based on those records, the Defendant visited casinos 21 times over the course of 9 years.  While it appears the Defendant may enjoy gambling,

these records do not support a severe gambling addiction.  Yet even if the Court were to credit the Defendant's arguments, this type of addiction hardly justifies the *enormous* scale at which the Defendant was trafficking methamphetamine.  Moreover, there is no indication that the Defendant was trafficking methamphetamine in order to pay his gambling debts.

In the course of the investigation, as well as after his arrest, the Defendant showed his true character.  The Defendant is someone who preyed off of the vulnerabilities of others.  He manipulated and took advantage of his wife and pulled her into his criminal enterprise.  The Defendant took advantage of Keleman, who fell for what appeared to be kindness, and soon was ensnared in a complex organization that distributed hundreds of kilograms of pure methamphetamine in a matter of months.  The Defendant recruited methamphetamine distributors who were addicts, knowing that they were desperate and would sell his product in order to support their own addictions.

The sixty days of interceptions painted a very clear picture of the dark criminal mind of the Defendant; someone who puts others at risk or in danger for his own benefit and gain.  For example, on May 22, 2021, while the Defendant was delivering methamphetamine to his distributors, investigators intercepted a call between the Defendant and his wife during which he told her he was out doing "drug runs."  The Defendant went on to tell his wife that he had "Nu-Nu" with him and he told her, "Train 'em from a young age… no one will suspect a handicap kid drug – uh, delivering drugs."  As another example, which is described in detail in the PSR, the Defendant attempted to hire Watson to collect drug debts from one of the Defendant's methamphetamine distributors; potentially by use of force.  PSR, ¶¶ 46-52.  Investigators were concerned enough by those interceptions that they stepped in to mitigate what they viewed as a threat to an individual's safety.  *Id*.  That is the true character of this defendant; the person revealed

when he thought no one was listening. In fact, when he knew people were listening, when he sat for a proffer with the government, he lied based on what he *thought* the government knew and based on who he *thought* was the CW in the case.

### 3. Need for the Sentence Imposed

As the discussion above regarding the nature of the offense makes clear, there is a compelling need to deter individuals who may be inclined to participate in drug trafficking — particularly substances as dangerous as methamphetamine. A significant sentence of imprisonment is warranted to deter individuals from engaging in trafficking of methamphetamine and unlawful possession of firearms, as the dangers associated with that conduct cannot be overstated. Individuals tempted to engage in drug trafficking must understand that *any* involvement with methamphetamine will have immediate and harsh consequences. Imprisonment is necessary to send a strong warning to those who might otherwise consider involvement with this dangerous drug that they must resist the temptation.

The sentence recommended by the government would promote respect for the law, would be just punishment for the offense, and would protect the public from further crimes of the Defendant. The sentence requested by the Defendant – the statutory mandatory minimum – is insufficient to achieve the goals of sentencing. Sentencing the Defendant to the minimum required by statute, or even slightly above that, would send the wrong message both to the Defendant and to others who might otherwise engage in this horrific conduct, it would inadequately punish the Defendant, and it would not sufficiently protect the public from future crimes of the Defendant.

## <u>CONCLUSION</u>

For the reasons set forth herein, and as will be addressed at the sentencing hearing, the government recommends that the Court sentence the Defendant to 360 months of prison, five years

of supervised release, a mandatory special assessment of $500, and forfeiture as set forth in the

Second Superseding Indictment.


Dated: September 12, 2024                    Respectfully submitted,

                                             JOSHUA S. LEVY
                                             Acting United States Attorney

                              By:    /s/ Alathea E. Porter
                                     ALATHEA E. PORTER
                                     Assistant U.S. Attorney




                          CERTIFICATE OF SERVICE

        I, the undersigned, hereby certify that this document filed through the ECF system will be
sent electronically to the registered participants as identified on the Notice of Electronic Filing
(NEF) on September 12, 2024.

                                     /s/ Alathea E. Porter
                                     ALATHEA E. PORTER
                                     Assistant U.S. Attorney