```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3     UNITED STATES OF AMERICA,        )
                                        )
 4                      Plaintiff       )
                                        )  No. 1:21-cr-10208-NMG
 5     vs.                              )
                                        )
 6     RESHAT ALKAYISI,                 )
                                        )
 7                      Defendant.      )
                                        )
 8                                      )
                                        )
 9

10

11          BEFORE THE HONORABLE NATHANIEL M. GORTON
                  UNITED STATES DISTRICT JUDGE
12                       Sentencing

13

14

15        John Joseph Moakley United States Courthouse
                      Courtroom No. 4
16                   One Courthouse Way
                  Boston, Massachusetts 02210
17

18                   September 17, 2024
                        11:05 a.m.
19

20

21            Kristin M. Kelley, RPR, CRR
                   Official Court Reporter
22        John Joseph Moakley United States Courthouse
                  One Courthouse Way, Room 3209
23               Boston, Massachusetts 02210
                  E-mail: kmob929@gmail.com
24

25        Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3            Alathea E. Porter
               United States Attorney's Office MA
 4            1 Courthouse Way
               Suite 9200
 5            Boston, MA 02210
               617-748-3318
 6            alathea.porter@usdoj.gov
               for Plaintiff.

 7

 8            Mark W. Shea
               Shea & LaRocque LLP
 9            88 Broad Street
               Suite 101
10            Boston, MA 02110
               617-577-8722
11            markwshea@gmail.com
               for Reshat Alkayisi.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
  1                    P R O C E E D I N G S
  2              THE CLERK:  All rise.
  3              (The Honorable Court entered.)
  4              THE CLERK:  Thank you.  You may be seated.  This is
  5    Criminal Action No. 21-10208, the United States of America
  6    versus Reshat Alkayisi.
  7              Would counsel please introduce themselves for the
  8    record.
  9              MS. PORTER:  Good morning, your Honor.  Alathea Porter
 10    on behalf of the United States.
 11              THE COURT:  Good morning, Miss Porter.
 12              MR. SHEA:  Good morning, your Honor.  Mark Shea on
 13    behalf of Reshat Alkayisi.
 14              THE COURT:  Good morning, Mr. Shea, Mr. Alkayisi.
 15              Miss Patten we have from Probation, good morning.
 16              PROBATION:  Good morning, your Honor.
 17              THE COURT:  We are here for the sentencing of
 18    Mr. Reshat Alkayisi.  I have received and read the presentence
 19    report, the government's sentencing memorandum, the defendant's
 20    Sentencing Memorandum, two letters submitted by Central Falls
 21    Detention Facility, a group of certificates of completion of
 22    certain courses that the defendant has completed, and a letter
 23    from a psychiatric evaluation from the University of California
 24    Los Angeles psychologist.
 25              Those are the writings I have received.  Is there
```

11:05 at line 5, 11:05 at line 10, 11:06 at line 15, 11:06 at line 20, 11:07 at line 25

1    anything I haven't mentioned that I should have received?

2    Miss Porter?

3            MS. PORTER:  Your Honor, I believe defense counsel

4    handed something up to the Clerk this morning, but other than

11:07  5    that, no.

6            THE COURT:  Yes.  Apparently, there is a CD that has

7    been submitted but I haven't heard it.

8            MR. SHEA:  I apologize for that.  It's just something

9    I thought of at the last minute, your Honor, ████████████████

11:07  10    ██████████████████████████████████████████████████████████████

11    ██████████████████████████████████████████████████████████████

12    ██████████████████████████████████████████.  I was going to refer to it

13    in argument.

14            THE COURT:  You may refer to it but I'm not going to

11:07  15    listen to it before the sentencing.

16            MR. SHEA:  No.  I understand, and I wasn't expecting

17    that.

18            THE COURT:  Okay.

19            MR. SHEA:  I just wanted it since I was referring to

11:07  20    it.  I thought I should make it part of the record.

21            THE COURT:  That's fine.  Anything else that I didn't

22    mention that I should have received?

23            MR. SHEA:  No.  Thank you.

24            THE COURT:  All right.  Then turning to the

11:08  25    presentence report, there were several objections entered by

1    the defendant to that presentence report.  As I read them,

2    Mr. Shea, the first eight are what I would call informational.

3    They have no impact on the establishment of the guidelines, is

4    that correct?

11:08   5           MR. SHEA:  Yes.  Some include information that's

6    relevant to part of what we might be arguing over.

7           THE COURT:  Yes.

8           MR. SHEA:  But they are information.

9           THE COURT:  It is part of the record and will be, but

11:08  10   they don't need to be further argued here at this time,

11   correct?

12          MR. SHEA:  I agree with that.

13          THE COURT:  All right.  So that then takes us up to

14   objection No. 9, which objects to the plus four enhancement

11:08  15   given because the Probation Officer recommends that I give him

16   a leadership/organizer adjustment under guideline 3B1.1(a).

17          I read the Probation Officer's response and agree with

18   it, but if you wish to be heard further on that objection, I

19   will hear you, Mr. Shea.

11:09  20          MR. SHEA:  Thank you, your Honor.  I do object on a

21   few different levels.

22          One, the government, in its Sentencing Memo, points to

23   unindicted co-conspirators that it doesn't even name that are

24   supposed to be part of the five, so those remain unclear or not

11:09  25   shown proven in any way to the Court.

1            Mr. Keleman is listed.  To be fair, Mr. Keleman is

2    listed as being part of the conspiracy, meaning working

3    directly with Mr. Alkayisi, although I would point out that the

4    government has from one of its cooperators, cooperator No. 2,

11:10  5    who had described Mr. Keleman as a partner and not under

6    Mr. Alkayisi.  I think that's important as to this particular

7    guideline enhancement.

8            Getting into the three people mentioned by the

9    government in their Sentencing Memo, which would be Miss Costa,

11:10 10    Mr. Watson and I forget the other fellow's name, Mr. Joyce I

11    think it is, who is related to Miss Costa.  So part of what the

12    government points to is to say that Mr. Alkayisi paid when

13    Miss Costa and Mr. Joyce got arrested.  The government paid --

14    I'm sorry.  Mr. Alkayisi paid their bail and they use that as

11:11 15    evidence that that shows that he was over them or leading them

16    in some way.  I would point out that they were running their

17    own operation.  They were being supplied at times by other

18    people and that Mr. Alkayisi, and this is part of what we

19    objected to in the parts of the objections that were more

11:11 20    informational, was that as to Miss Costa, Mr. Alkayisi had had

21    an intimate relationship with her so that's a reason that

22    doesn't involve the conspiracy for him to have posted her bail.

23            Another concern would have been that they might have

24    cooperated against him.  That doesn't mean necessarily that

11:12 25    they're in a conspiracy together, meaning you can post bail for

1    someone who is not working for you directly but who you're just

2    supplying and out of concern for the fact that they will give

3    information against you.

4    The other argument I would make is in the *Arber* case,

11:12    5    which is a First Circuit case on this issue, part of what they

6    pointed to in the *Arber* case is that defendant *Arber* had

7    provided firearms to other people in the conspiracy, and his

8    was a drug conspiracy.  They go on to say that they directed

9    what he did and he even chose what firearms that people under

11:12    10    him would have.

11    Now, in this case, Miss Costa, and I think it's

12    Mr. Joyce, had their own firearms never supplied by

13    Mr. Alkayisi.  He had nothing to do with that.  They chose to

14    arm themselves but meaning that, in contrast to the *Arber* case,

11:13    15    they are free and flowing actors working on their own.  That's

16    the point I'm trying to make with that.

17    Lastly, I would point to the fact that the guideline

18    itself, I object to the use of any commentary in the guideline

19    given the recent Supreme Court decision on *Loper Bright v.*

11:13    20    *Raimondo* because, in that case, the Court seems to have vacated

21    or overruled the *Chevron* case.  The Guidelines' commentaries --

22    THE COURT:  That's a unique commentary.  I didn't

23    think we'd hear about *Chevron* today, but go ahead.

24    MR. SHEA:  The reason I point to it here is I'm making

11:14    25    an argument that is both on status -- the number of people and

```
         1    the status of my client.  The commentaries say that if you get

         2    to the magic number of five, then you only have to show that he

         3    actually managed one of the five, and that is where my

         4    objection lies where I'm using Loper because the First Circuit

11:14    5    has said, even in Arber, that that was sufficient, but they

         6    also say that not all circuits have adopted using the

         7    commentary that way.  It does appear that in other cases, now

         8    at this point it's been on intended loss, actual loss versus

         9    intended loss, but there was already a split in the circuits on

11:15   10    whether the commentary can be used on that.

        11              THE COURT:  You understand that the provision that

        12    you're talking about, 3B1.1(a), talks about five or more

        13    participants or is otherwise extensive?  Are you arguing this

        14    wasn't an extensive conspiracy?

11:15   15              MR. SHEA:  I am arguing that but I'm also arguing the

        16    secondary part, which is the part that's in the commentary,

        17    which is --

        18              THE COURT:  I don't need to get to the commentary.

        19    The language of the rule itself says "or otherwise extensive".

11:15   20    Are you telling me you believe this conspiracy was not

        21    extensive?

        22              MR. SHEA:  Yes, in terms of Mr. Alkayisi's management

        23    or role in it.

        24              THE COURT:  I don't know what case you've been looking

11:16   25    at, Mr. Shea, but it's not the same one I've been seeing.
```

1          MR. SHEA:  I believe that it's also, once you get to

2    that five, you also have to show specifically that he managed

3    one, and I don't think without the commentary that that happens

4    here.

11:16  5          THE COURT:  All right.  Does the government have a

6    position?

7          MS. PORTER:  Your Honor, the government agrees with

8    Probation's analysis as well as the Court's.  It is clear from

9    the evidence in this case that Mr. Alkayisi led and organized

11:16 10   and directed the conduct of more than five individuals and that

11   this conspiracy was otherwise extensive.  In terms of the

12   unindicted co-conspirators, those individuals have been

13   identified.  They're listed in detail by name in the

14   presentence report.  The government chose not to name them in

11:16 15   the publicly filed document.  The defendant is well aware of

16   who those individuals are, including the person who was

17   directed to hide the guns after his 100 pounds of

18   methamphetamine were seized.

19          Your Honor, it's clear that Mr. Alkayisi organized and

11:17 20   led a number of different individuals in this case and, as the

21   Court has made clear, he needs to only manage or supervise one

22   of those individuals.  He certainly did that.  The criminal

23   activity here certainly involved more than five individuals as

24   11 people were charged in the Second Superseding Indictment.

11:17 25   The conduct was definitely extensive, otherwise extensive.  It

1    went across the entire country through multiple states.

2    Methamphetamine was shipped from California to New England.

3    Mr. Alkayisi lived in Rhode Island.  He distributed that

4    methamphetamine to individuals in Maine, in New Hampshire, in

11:17  5    Massachusetts, in Connecticut, in Rhode Island.  This conduct

6    was absolutely extensive, your Honor, and he certainly meets

7    the standard and the elements for the role enhancement of four

8    levels appropriate here.

9            THE COURT:  Thank you.  The Court overrules objection

11:18 10    No. 9 and agrees with the Probation Officer --

11            MR. SHEA:  Just --

12            THE COURT:  Yes?

13            MR. SHEA:  I want my objection noted.

14            THE COURT:  Your objection is noted.  I overrule

11:18 15    objection No. 9 and agree with the Probation Officer that there

16    were more than five individuals involved in this conspiracy

17    that was extensive and that this defendant was the leader of at

18    least one of those individuals, therefore the four-level

19    enhancement is warranted.

11:18 20            Objection No. 10 claims that the defendant is entitled

21    to a two-level downward adjustment because he is a zero point

22    offender.  Probation disagrees on three grounds:  First, that

23    he has three criminal history points; second, that he possessed

24    a firearm; third, that he received an aggravated adjustment,

11:19 25    role adjustment, which has just been confirmed.

1          Do you have any further argument on objection No. 10,

2     Mr. Shea?

3          MR. SHEA:  No.  I would concede as to the firearm.  I

4     agree with them on that.

11:19  5          THE COURT:  All right.  So that objection is

6     overruled.

7          Objection No. 11 is derivative of objections nine and

8     ten, which have been overruled before, and therefore it is

9     overruled.

11:19 10          The second objection 11, which we could call 11(a), is

11     an objection only to the only scored conviction that awarded

12     this defendant 3 points and recites a First Circuit case, the

13     *Brown* case.

14          Do you wish to further argue that objection, Mr. Shea?

11:19 15          MR. SHEA:  Well, I'm just objecting to the counting of

16     any prior conviction without the certified copies of conviction

17     being provided to the Court.

18          THE COURT:  The Probation Officer's response was the

19     court records are available for counsel's review.  Did you take

11:20 20     advantage of that?

21          MR. SHEA:  Yes, I did.

22          THE COURT:  And you're telling me that I can't decide

23     this issue without having it part of the record?

24          MR. SHEA:  I'm asking that it be part of the record in

11:20 25     order for you to count it, yes.

1          THE COURT:  I'll ask Miss Patten about that.

2          PROBATION:  Your Honor, I do not believe it needs to

3    be part of the record for you to find that it's a scorable

4    offense.  I think the guideline lays it out accurately that it

11:20  5    can be scored based on the time frame.

6          THE COURT:  That's the Court's understanding and,

7    therefore, overrules the second objection 11, which I've been

8    referring to as objection 11(a) to paragraph 132 of the

9    presentence report.

11:20  10          MR. SHEA:  Just note my objection.

11          THE COURT:  I note Mr. Shea's objection.

12          Objections 12, 13 and 14 are all derivative on this

13    previous objection just overruled, so they are overruled as

14    well.

11:21  15          That leaves us with objection No. 15, which are two

16    factors that may warrant a sentence outside the advisory

17    guideline system.  The Probation Officer has offered those

18    comments provided for the Court's review.

19          Do you wish to further argue that objection, Mr. Shea?

11:21  20          MR. SHEA:  No.  I think I'll capture it in my

21    argument, thank you.

22          THE COURT:  All right.  Then as far as the Court is

23    concerned, the defendant is not entitled to a downward variance

24    for any of the reasons argued in objection 15, so objection 15

11:21  25    is overruled.

1          Those are all the objections that I am aware of.  Are

2    there any others, Miss Porter?

3          MS. PORTER:  No, your Honor.

4          THE COURT:  Or Mr. Shea to the presentence report?

11:22  5          MR. SHEA:  No, thank you.

6          THE COURT:  Then we need to turn to the

7    recommendations with respect to the guidelines in the

8    presentence report.  They start on page 36, wherein I am

9    advised that the 2023 Guideline Manual applies and that within

11:22 10    that manual, we are dealing with three sections, the drug

11    trafficking section, 2D1.1, the use of a firearm in

12    furtherance, which is 2K2.4, and the money laundering

13    guideline, which is 2S1.1.

14          Because 2S1.1 yields the higher of the offense levels

11:22 15    between the drug trafficking and money laundering, that's where

16    we start.  The second one with respect to the use of the

17    firearm in furtherance is statutorily -- there's a statutorily

18    mandated term of imprisonment that is required to run

19    consecutively, which is 5 years, because the firearm was used

11:23 20    or possessed in furtherance of a drug trafficking crime.  That

21    particular enhancement that would have gone in the drug

22    trafficking section cannot be added there because of that

23    automatic on and after of 2K2.2.

24          So starting with the money laundering guideline, 2S1.1

11:23 25    refers back to the guideline for drug trafficking.  Because the

1    defendant is held accountable for at least four and a half

2    kilograms of pure methamphetamine, the base offense level is 38

3    pursuant to 2S1.1(a)(1) and 2D1.1(a)(5).

4          Do counsel agree with that calculation?  Miss Porter?

11:24  5    MS. PORTER:  Yes, your Honor.

6          THE COURT:  Mr. Shea?

7          MR. SHEA:  Yes.

8          THE COURT:  The Court so finds.

9          Then with respect to the fact that the defendant

11:24  10    maintained a premises for the purpose of manufacturing or

11    distributing a controlled substance, a two-level increase is

12    warranted under guideline 2D1.1(b)(12).

13          Do counsel agree with that calculation or that

14    recommendation?  Miss Porter?

11:24  15          MS. PORTER:  Yes, your Honor.

16          THE COURT:  Mr. Shea?

17          MR. SHEA:  I agree with the calculation.

18          THE COURT:  The Court so finds.

19          Then, as we have previously determined, the defendant

11:24  20    was an organizer or leader of a criminal activity that involved

21    five or more participants or was otherwise extensive, therefore

22    a four-level increase is applied pursuant to guideline

23    3B1.1(a).  That means the adjusted offense level in this case

24    is 44.

11:25  25          The defendant is entitled to a three-level downward

1    adjustment for his acceptance of responsibility, therefore ends

2    up with a total offense level of 41.

3            Turning to the defendant's criminal convictions, there

4    are six convictions that are listed in the presentence report

11:25  5    but only one of those is scored because of the age of the

6    remaining five convictions.  The conviction in 2012 for

7    possession and dealing with marijuana more than 5 kilograms of

8    marijuana or, actually, it's a Schedule I, Schedule II drug,

9    Count Two, he gets three criminal history points for that.  And

11:25 10    even though he committed the instant offense while under the

11    criminal justice sentence of that particular crime, it is

12    less -- he has less than seven criminal history points,

13    therefore no additional points are added under 4A1.1.  He ends

14    up with three criminal history points and falls in Criminal

11:26 15    History Category II.

16            Do counsel agree with those calculations?

17    Miss Porter?

18            MS. PORTER:  Yes, your Honor.

19            THE COURT:  Mr. Shea?

11:26 20            MR. SHEA:  Without waiving my prior objection.

21            THE COURT:  I understand, without waiving.

22            That means at offense Level 41, Criminal History

23    Category II, the guideline range is 360 months to life.

24            I will hear recommendations for sentence --

11:26 25            MR. SHEA:  Can I just address briefly?

1          THE COURT:  Yes.

2          MR. SHEA:  I'll be brief.  I do think that *Loper* also

3     calls into question the legitimacy of using the guidelines at

4     all because in the past when the courts have reviewed the

11:26  5     Sentencing Guidelines, and I mean the Supreme Court and the

6     circuit courts, they've referenced *Chevron* deference as a

7     reason that the Court should use the Sentencing Guidelines.  If

8     *Chevron* has been overruled and *Loper*, then there's no

9     legitimacy to the Sentencing Guidelines left.  So I object to

11:27 10     us beginning the process.

11          THE COURT:  I'll let you take that up with the Supreme

12     Court.

13          MR. SHEA:  Thank you.

14          THE COURT:  I'll hear recommendations for sentencing,

11:27 15     starting with the government.  Miss Porter?

16          MS. PORTER:  Yes.  Thank you, your Honor.

17          The low end of the guidelines is 360 months for the

18     drug trafficking offense, and the Court is required to impose a

19     60-month sentence from and after whatever sentence it imposes

11:27 20     for the drug trafficking offense in this case, your Honor.

21          As the Court is aware, the government is recommending

22     a sentence of 360 months in total for defendant Reshat

23     Alkayisi.  The government does not make this recommendation

24     lightly.  This recommendation comes after careful thought and

11:28 25     consideration.  It is not every day that the government finds

1    itself making such a significant sentencing recommendation, but

2    it is not every day that the defendant finds a -- that the

3    government finds a defendant like Reshat Alkayisi.  It is not

4    every day that the government is faced with the atrocious

11:28    5    criminal conduct of someone like Mr. Alkayisi.

6            This investigation began in the fall of 2020 when the

7    FBI Boston Strike Force began investigating a large scale

8    methamphetamine drug trafficking organization in the Boston

9    area.  After several months of investigation, the agents

11:28  10    identified the defendant Reshat Alkayisi as the leader of that

11    drug trafficking organization.

12            At the time of his arrest in 2021, Mr. Alkayisi was

13    the largest methamphetamine distributor in the New England

14    area.  He was getting tens, if not hundreds, of pounds of

11:28  15    methamphetamine shipped to him from California every single

16    month.  He was getting that methamphetamine in California at a

17    cheap rate and he was selling it at a huge profit to multiple

18    people who were further distributing that dangerous drug

19    throughout New England.

11:29  20            In May of 2021, investigators received authorization

21    to intercept Mr. Alkayisi's phone.  They did so for 60 days.

22    Based on those interceptions, along with additional

23    investigation, they identified a number of Mr. Alkayisi's

24    distributor customers.  They learned that he was regularly

11:29  25    providing them with distributor quantities of pure

1    methamphetamine.

2            Mr. Alkayisi was not a drug addict.  He wasn't selling

3    this dangerous drug to support his own drug addiction.  He was

4    a businessman.  He was doing it to make a profit, and he made

11:29 5    that profit off of the pain and suffering of others.  He

6    bragged about the purity of his methamphetamine.  He bragged

7    about how addictive it was and how it would cause his customers

8    to keep coming back for more.  He prayed on the suffering of

9    those who were addicts.  He manipulated those around him to get

11:30 10    them to do his criminal bidding.  He recruited addicts to be

11    his drug distributors and he paid their bail when they were

12    arrested so they could go out and continue distributing his

13    methamphetamine for his profit.

14            He prayed upon his own wife.  He manipulated her.  He

11:30 15    dragged her into his criminal enterprise and he directed her to

16    launder his drug proceeds.  He took advantage of people down on

17    their luck, like co-defendant Brian Keleman, who needed a job

18    and a place to stay.  He pretended to care about Mr. Keleman

19    and then he brought him into his criminal enterprise and he

11:30 20    directed him to distribute his methamphetamine, to collect that

21    methamphetamine, collect that drug proceeds, and to launder the

22    drug proceeds on behalf Mr. Alkayisi.

23            Now Mr. Keleman and Mr. Alkayisi's wife both stand as

24    convicted felons who are going to serve significant prison

11:30 25    sentences.  The defendant is not a remorseful man.  He is not

1   an honest man.  Counsel's characterization of Mr. Alkayisi as

2   having extraordinary acceptance of responsibility is a farce

3   that is not based in reality.  ███████████████████████████

4   ███████████████████████████████████████████████████████

11:31  5   ███████████████████████████████████████████████████████

6   ███████████████████████████████████████████████████

7   ██████████████████████████████████████████

8           The defendant didn't plead guilty in this case until

9   the eve of trial, and then when it came to the presentence

11:31 10   report, he made frivolous objections, such as that he would be

11   entitled to the zero point offender, which as this Court just

12   went over, he was disqualified from on three separate grounds,

13   including that he pled guilty to a disqualifying offense.

14           The 60 days of interceptions of Reshat Alkayisi

11:31 15   painted a very clear picture of the defendant before you,

16   someone who puts others at risk, someone who puts others in

17   danger for his own benefit and gain.  This is a man who

18   manipulated others to do his dirty work.  This is a man who

19   profited off of the pain and suffering of others.  This is a

11:32 20   man who tried to get someone to shake down his drug customers

21   who owed him money, potentially by force.

22           This is a man who, when he didn't know that the agents

23   were listening, was going around doing drug deliveries with a

24   child in his car and then joking about it.  He joked, saying,

11:32 25   train them young, and how no one will suspect a handicap kid

1    delivering drugs.  That is the true character of this

2    defendant.

3             Defense counsel's made arguments about a supposed

4    gambling addiction, a claim of gambling addiction that he says

11:32  5    the defendant suffers from, but based on the records that the

6    defendant provided, there is no support for that claim.  Over

7    the course of the conspiracy period, about 17 months, it looks

8    like he went to casinos, based on those records, on about four

9    separate occasions.  Over that time it looks like he had a

11:33  10   potential loss of $8,000.  We know from the investigation he

11   traveled to Las Vegas with family members, with his girlfriend,

12   with his wife.  These are vacations and he enjoyed gambling,

13   that's true, but the evidence does not support a gambling

14   addiction.  In his presentence interviews, he claimed to go to

11:33  15   casinos twice a week, but the records he provided showed no

16   support for such a claim.

17             Now, defense counsel cited a number of cases in other

18   courts where Courts have considered gambling addiction as a

19   mitigating factor.  The government submits that each of those

11:33  20   cases are factually distinguishable from the case here.  Those

21   cases involve corroborating testimony of other individuals

22   related to the defendant's conduct.  They involved huge debts,

23   loan sharks and daily gambling.  Those are not the facts

24   presented to this Court.

11:33  25             And with all due respect to Doctor Fong who issued

that report, he provides no basis for his claim that

Mr. Alkayisi's gambling contributed to his criminal conduct.

And even if the Court were to consider this as a

mitigating factor to agree that maybe the defendant had a

gambling addiction, that addiction would hardly justify the

enormous amount of methamphetamine that he was distributing.

Let's talk about that amount.  Over the course of just

6 months, this defendant is responsible for over 239 kilograms

of pure methamphetamine, in 6 months.  That is more than 53

times the threshold amount to hit the base offense level here.

And let's be clear.  That is the top base offense level for the

drug trafficking guidelines.  Any argument that using the

methamphetamine actual or the pure guidelines here is too harsh

completely misses the mark.  It doesn't hold water under the

facts of this case, because even if we were talking about this

quantity with the methamphetamine mixture, it would still be at

the same base offense level.  If we were talking about this

quantity of Fentanyl, it would be at the same base offense

level.  The guidelines would by the same.

Make no mistake, your Honor.  This is not a victimless

crime.  Methamphetamine is a highly addictive, dangerous and

devastating drug that destroys lives.  Tens of thousands of

people are dying every year from methamphetamine abuse and,

sadly, the statistics continue to get worse.  The CDC found

that overdose deaths from methamphetamine increased 703 percent

1    between 2011 and 2021, the time this defendant was distributing

2    this deadly substance.  The National Institute on Drug Abuse

3    found among people age 12 and older in 2021, 2.5 million people

4    reported using methamphetamine.  That's only reported use, your

11:36  5    Honor.  And given the highly pure and potent nature of the drug

6    the defendant was distributing, the effects of it cannot be

7    understated.

8         The consequences of methamphetamine are horrific.  In

9    addition to killing people, it also just destroys their lives,

11:36  10    the effects, physically and mentally and socially, on the

11    individuals who abuse this drug and those around them is

12    completely atrocious.  It causes severe mental problems.  It

13    causes psychosis, violent and aggressive behavior and

14    significant other physical problems.

11:36  15         And, of course, your Honor, the defendant was also

16    trafficking these substances while he possessed firearms

17    unlawfully.  He possessed an AK-47 assault style rifle.  He had

18    a Glock 9-millimeter handgun with no serial number, and he had

19    over 4,200 rounds of ammunition for those firearms.  He had an

11:37  20    arsenal to protect his drug trafficking business.  And what did

21    he do when he thought that the police were coming to raid his

22    property?  He directed someone to go hide those guns and that

23    ammunition.

24         As this Court is all too aware, it is difficult to

11:37  25    underestimate the danger associated with having guns in

combination with drug trafficking.  The government's
recommendation is a very significant one, but it is a downward
variance from where the guidelines are starting at 420.  In
fact, it is 60 months, or 5 years lower, than what the low end
would be if you take that into consideration.  That
recommendation takes into consideration potential mitigating
factors of the defendant, including his age.

        The defendant is asking this Court to impose a
sentence of 15 years.  That is the mandatory minimum that this
Court is required by law to impose based on the offenses of
conviction.  To sentence Mr. Alkayisi to the mandatory minimum
would fail to address the seriousness of this offense and the
characteristics of this defendant, as particularly here where
the amount at issue of pure methamphetamine is so
astronomically high.  To do so would create a sentencing
disparity where a defendant who is responsible for
4.5 kilograms of methamphetamine could receive the same
sentence as this defendant, who is responsible for over
239 kilograms.  The sentence that the defendant asks this Court
to impose, the mandatory minimum, would fail to promote respect
for the law.  It would fail to adequately deter others from
this conduct.  It would fail to adequately serve as a
deterrent.  It would fail to adequately punish this defendant
and it would fail to protect the public from the future crimes
of Reshat Alkayisi.

         1          The government recommends a very serious sentence in

         2    this case, your Honor, but in order to achieve all the goals of

         3    sentencing when considering all the factors in this case, when

         4    considering the defendant himself, that sentence is

11:39    5    appropriate, it is warranted, and it is the correct sentence

         6    for Reshat Alkayisi.

         7          Thank you.

         8          THE COURT:  Thank you, Miss Porter.

         9          Mr. Shea?

11:39   10          MR. SHEA:  Thank you.

        11          Judge, we understand what we're asking for, which is

        12    the 15 years, on its face may seem a light sentence, but I

        13    think in what I hope to lay out in my argument, when you look

        14    at the entirety of the situation, the individual and his age,

11:39   15    it is the appropriate sentence and the just sentence.  What the

        16    government is asking for is effectively a death sentence

        17    because my client is 63 years old.  A 30-year sentence makes it

        18    extremely unlikely that he would ever emerge from prison.  So

        19    that is, I think, an important place to start.

11:40   20          The government implied that at different points

        21    Mr. Alkayisi may have threatened other members of the

        22    conspiracy.  I would just say that that did not happen here.

        23    Mr. Watson was known to Mr. Alkayisi.  To know the other two

        24    people, that's how they knew each other, and so he inquired of

11:40   25    Mr. Watson about getting some money back.  At no point did he

1    say that force should be used, and no force ever was used.  So

2    we're standing here in a bad enough situation without trying to

3    heighten things with things that didn't actually happen.  So

4    I'd just like to make sure he gets sentenced for what he did

11:40  5    and not more implications that are not worthy.

6         As to the gun, we pled guilty to the gun.  It's true

7    Mr. Alkayisi had two firearms.  I disagree with the

8    government's statement regarding the guns.  Mr. Alkayisi did

9    make a phone call when he believed the federal government was

11:41 10    going to raid his property.  He made the phone calls for the

11    Glock that was in his bedside table to be moved, not the AK-47

12    because the AK-47 wasn't there.  The AK-47 and the ammunition

13    were both in a place far from his home on this farm inside,

14    effectively, a barn, not anywhere within range for his use.

11:41 15    The Glock was in range in his bedside table, but I do think the

16    context is important here.

17         Mr. Alkayisi was running a marijuana farm, and that

18    was known to the public, and that was part of the face he had

19    where he hid his meth business.  We're not denying that and

11:42 20    we're not denying that the meth business is a horrible business

21    to be in, but to get back to this point, when you're running a

22    marijuana farm in the modern day and in the state it's legal

23    but in the federal government it's still illegal and so the

24    banks can't take money in, it is well known to criminal people

11:42 25    that there's a likelihood of cash being present on a marijuana

farm.  So yes, Mr. Alkayisi pled guilty to having a gun, but
it's not unreasonable for him to have some fear that his home
could be invaded.  I've represented more than a few individuals
in the Massachusetts courts who did just that, invaded drug
dealers' homes.  Now I don't say that that makes it right but I
do think it's contextually important.

        The thing is, Mr. Alkayisi drove around and delivered
methamphetamine to different customers.  Never did he have a
weapon.  He never carried a weapon around.  He never had a
weapon on him.  The reason he ever contacted Mr. Watson
regarding Miss Costa and Mr. Joyce was that Miss Costa and
Mr. Joyce had firearms that they carried around and
Mr. Alkayisi never used the firearm.

        So he pled guilty to it and he is guilty of having the
firearm, but I do think it is important to put it in context of
how it was used, meaning never, and that it was in the table
beside his bed.  And yes, he tried to hide it from the federal
government, but he didn't ask anyone to use it against the
federal government.  He asked them to hide it.  I don't
think -- and we've admitted to that criminal conduct.

        Now, meth is a terrible plague, we're not denying
that, and that people are being hurt.  Mr. Alkayisi doesn't
deny that he hurt people, and he is regretful of that, but part
of what we point to in our Sentencing Memo is that the far
bigger crisis in this country is the opioid crisis and

1    statistically that is a fact.  There is no dancing around that

2    fact and no one seems to get anything remotely close to

3    15 years for that.  In fact, the Sackler family never even

4    finds itself in any court but a civil court and it often seems

11:45  5    to have made deals there so it doesn't even have to go to

6    court.  If you made enough money, you don't really get

7    punished.

8            And then, in this very court, and I cited in my

9    footnote, and I don't mean your court, your Honor, but in this

11:45  10   courthouse, there's been sentences handed out to drug companies

11   who participated in the opioid crisis.  The point I was trying

12   to make in the Sentencing Memo is yes, Mr. Alkayisi took

13   advantage of addicted people, and that is a terrible thing for

14   which he repents, but the larger opioid conspiracy was to

11:45  15   addict people, to take people who had no addiction and to get

16   them addicted through the use of doctors, through the use of

17   the medical establishment and industry, and those folks don't

18   get punished.

19           So when we talk about sentencing disparities, the

11:46  20   highest sentence given out in that drug case in the federal

21   court in Boston for a wide ranging conspiracy involving a drug

22   company that literally had its salespeople bribing doctors to

23   prescribe their opioids, the highest sentence given was

24   6 years, which would be 9 years less than what I'm asking for.

11:46  25   So I do think that it's appropriate to look at that,

|     |     |
|-----|-----|
|     | 1   |
particularly when the opioid crisis, as we pointed out, has

killed twice as many people as the meth crisis.

        Now, the other thing in this particular case too in

terms of sentences handed out thus far, I believe Miss Costa

got 9 years.  She was a significant dealer, traveled even with

Mr. Alkayisi to buy large amounts of meth, had a firearm

herself.  Mr. Watson, I believe, got 12 years, but he has an

extensive criminal history that I think drove, in a large part,

his sentence.  I wasn't present for his sentence but I think

that's a fair statement regarding his sentence.  So my reason

for bringing that up is that 15 years would be by far the most

severe sentence in this case and it's not out of line with the

other sentences that have been handed out in this case.

        Mr. Tavella stands to be sentenced sometime in the

future.  I'm not sure by this Court, I don't think, but he was

the supplier.  He was the reason that the drugs were pure,

meaning Mr. Alkayisi never manufactured or did anything with

the drugs.  He just resold the drugs he got.  So the purity is

actually on Mr. Tavella, the supplier.



11:49    5

11:49   10

11:50   15

11:50   20

11:51   25         Now, the government has kind of attacked Mr. Alkayisi

1    as a bad person, basically.  One of their own cooperators,

2    cooperator No. 2, when asked to describe Mr. Alkayisi literally

3    said, and I am reading from the report, "Alkayisi is an idiot

4    and greedy" in describing how Alkayisi sold methamphetamine.

11:51  5    That is what people actually thought of him.  And he didn't use

6    fake names.  He used his own name.  Everyone in this thing knew

7    his own name.  He didn't comport himself in any way like a

8    regular drug dealer.

9          Miss Porter did another trial for Judge Hillman with a

11:52  10    fellow and she asked her agent regarding this, "in your

11    training and experience, did individuals who are engaged in

12    drug trafficking often use each other's names?  Do they

13    sometimes use code names?"

14          "They sometimes use no name at all or code names or

11:52  15    all of the above."  No, not here.

16          But here's even more important.  "In your training and

17    experience of over a decade of narcotics investigations, how

18    common is it to observe hand to hand deals by higher level

19    suppliers?"

11:52  20          "It's very unlikely."

21          Well, that actually happened here.  Mr. Alkayisi is on

22    numerous videotapes actually making the sales.  Now I'm not

23    saying that's to his credit, but I do think it shows more

24    realistically who he is, not a big time dealer.  Yes, the

11:53  25    numbers are high.  I'm not denying that, but he did not act in

1    any way like someone who knew what he was doing.

2         I'm trying to get across the reality of who the man

3    is.  The other people here think he's an idiot.  He doesn't

4    follow any of the ways of doing business that federal agents

11:53 5    say are common practice.

6         And so why is that?  It's because he did have a

7    gambling addiction and does have a gambling addiction.  Now he

8    has stopped gambling since being incarcerated but the reality

9    is that Reshat Alkayisi was a marijuana dealer.  The people he

11:53 10    knew from marijuana dealing are the people who introduced him

11    to the meth business.  Why did he move from the marijuana

12    business to the meth business?  Profit.  Why did he need more

13    money?  Because he was a gambling addict.

14         Now the government says that Mr. Alkayisi wasn't

11:54 15    really an addict, yet in their own Sentencing Memo, on page 4,

16    they say "during the 60 days of interceptions, the defendant

17    regularly traveled to Las Vegas, Nevada".  So in their own memo

18    from their own interceptions he's regularly in Las Vegas,

19    Nevada.  He never does any drug deal there, none.  There's no

11:54 20    allegation of ever meeting anyone there, doing any drug deal

21    there, or having anything to do with it.  He's in Las Vegas,

22    Nevada because he's gambling.  We place him at numerous casinos

23    with the GPS gambling.

24         Now, not all of the amounts gambled could we document

11:55 25    because unless you use a player's card, they don't actually

know.  If I go to the Encore Casino this afternoon, they're not going to know how much I gambled unless I decide to tell them that I am there and want to try to get the benefits of being a big wheel or something.  If Mr. Alkayisi was trying to fly under the radar or not show how much money he had or not let family members know that he had a gambling problem, then the casino also does not know.

And the most glaring point here is that, yes, large amounts of meth were sold.  We're not denying that.  The government, in its own argument, said huge profits.  Again, let's just use their own words, huge profits.  All right.  So there are huge profits.  They know how to track money.  I have all sorts of forfeiture cases.  I have all sorts of cases where they go to seize assets, right?  You've seen this on probably more occasions than I have and know that the government knows what it's doing and how to do it.

In this case, all there are is a couple motor vehicles.  So if he made $2 million in profit and they seize nothing but a couple motor vehicles, where is the money?  It's at the casinos.  And we employed an expert who is an expert in this field, one of the people who led to it being in the DSM-IV and DSM-V, meaning by doing the studies that showed how the brain changed when you were under the addiction of gambling. And we tried to show in our memo how it wasn't even considered an illness pre 1980 by the DSM.  Then by DSM-III in the 1980s

1   it's included but different category, and now it's rightfully

2   been included in the category that is similar to alcoholism and

3   substance abuse.

4        And I do think, as a society, we can't decide to

11:57  5   legalize gambling and to make huge profits.  I think it was

6   $62 billion was made in the gaming industry and then turn a

7   blind eye to the fact that people are addicted.  It's a

8   reality.  And my client is addicted, and it doesn't make any

9   sense for the government to argue otherwise when they literally

11:58 10  track him to all the casinos and then they can't locate any of

11  the profit.

12        The guidelines talk about not giving people credit for

13  gambling.  That's why we ask for a variance.  I do think the

14  point under *Loper* is you're not bound by whatever the

11:58 15  guidelines suggest and so you can depart or, I'm sorry, give a

16  variance based on my client's gambling addiction, which is

17  really what drove him into this business and drove this case.

18        Now, my client has suffered real losses from this

19  case.  We're not denying other people were hurt, but he's lost

11:59 20  his granddaughter, died while he was incarcerated.  He

21  basically lost his family at this point, and he's going to be

22  deported, and he's 63 years old.

23        I'd also point to a certain law in economics argument

24  here in terms of a 15-year sentence.  At the current rate, it's

11:59 25  $42,000 a year.  Obviously, that will go up in terms of how

much it costs to incarcerate someone.  It costs more to
incarcerate older people.  The sentence the government is
asking for is going to cost, at current rates, close to
three quarters of a million dollars for someone who could be
back in Turkey and be their problem to deal with economically
as he gets older.

Now, the 3553(a) conditions, I do think this is the
kind of sentence, 15 years, that no one wants to serve.  So it
is plenty long to get the public's attention and to show that
there is significant punishment here, but when you look at the
individual, I do think the sentence we're asking for becomes
reasonable.  And it's because there has been, besides the
addiction, extraordinary rehabilitation.  You have the letters
from Wyatt.  There's just so much someone can do.  Part of why
a detention hearing is so important in these courts is, when I
can get a client out, they can do so much more when they're
outside.  That's a fact.  Obviously, Mr. Alkayisi was not going
to be released on pretrial release given the facts of this
case.  We understand that.

In the 3 years, he has sought to do real change, and
I've seen real change in this man.  He now teaches religious
courses.  He is the person who gives the sermons at Wyatt now.
He works in the kitchen and has been in a leadership role in
the kitchen.  He organizes the meals for everybody, but
particularly at the time of Muslim fasting and different Muslim

1    customs, he is in charge of creating the menu that fits with

2    the fasting times and then the eating after the fast is over.

3         So he's grown.  He would acknowledge that when this

4    case was happening, he was very much a lost soul.  Part of why

12:02  5    he feels terribly guilty that his wife is going to go to jail

6    at all in this case is because it's his fault, and he

7    understands that, but also not only that, at the time he

8    brought another woman into the marriage.  He put his wife

9    through all sorts of emotional turmoil while he was trying to

12:02  10    show off at the casinos with women by his side.

11         He knows what a kind of vapid, horrible existence that

12    he lived that put others through terrible pain, and that's what

13    he's been trying to recover from, not just this case, but the

14    man he had become as opposed to the man he wants to be, and

12:03  15    that he saw that he had become much more like the people that

16    he grew up abhorring, like his father who actually abused him,

17    and that he wanted to be something different.

18         In these 3 years, he has set out to do that.  I can

19    say that that has happened in the sense that when I first had

12:03  20    his case, we went through all sorts of cockamamie discussions

21    about how I could get this thing dismissed.  Then I watched him

22    evolve as a human being at the same time that he evolved in how

23    he worked with me.

24         I saw him grow as a man and become a different person,

12:03  25    and the institutional letters back that up.  Now can I get more

for you from there?  No, because he's locked up.  But for
someone locked up, he did about as much as you can do.  There
is a religious community there of Muslim people that no longer
have someone coming in from the outside and he has filled that
12:04 role well for that institution.  That shows the changes in the
man.

Lastly, the reason that any sentence I believe more
than 15 years would be cruel and unusual punishment is not the
outward facts of the case, meaning the large amounts of meth or
12:04 that meth is terrible.  None of that is in dispute here.  It's
that we have a 63-year-old man who is definitely going to be
deported.  He's being deported to Turkey where we know he
hasn't lived since he was six years old.  So he's going to go
some place where he has no home, no employment, no family, no
12:05 social safety net, and he's going to be dropped in the streets
of Turkey.  If you give him the sentence that I have asked for,
he'll be probably 73 years old having to start an entirely new
life in a country he hasn't lived in since he was six years
old.  That seems to me to be a very severe punishment.

12:05 That's what I'm asking you to take into consideration,
meaning just the circumstances of where he lands makes it a
severe sentence, the one that I am imploring you to impose.
Anything greater puts him there at a greater age trying to
survive in a culture without many, if any, social safety nets
12:06 because, again, he doesn't have anything to fall back on.  He

1    hasn't worked for 30 years in Turkey.  He doesn't have anything
2    to draw upon.  And he doesn't have any family there to draw
3    upon.
4             So I appreciate the Court's time, and I'd ask the
12:06  5    Court to impose a 15-year sentence because in these particular
6    circumstances, it is a just sentence.
7             Thank you.
8             THE COURT:  Thank you, Mr. Shea.
9             Does Mr. Alkayisi wish to address the Court before
12:06 10    sentence is imposed?
11             THE DEFENDANT:  Yes, your Honor.
12             THE COURT:  You may do so.
13             THE DEFENDANT:  As you know, I am 63 years old, and it
14    has been documented that the government tracked me for the
12:06 15    9 months for their investigation and made a character
16    hypothesis of who I am.
17             The government's words is not who I am.  Yes, I do or
18    I did have an addiction, but given the letters that you have,
19    your Honor, I've been in incarceration for 3 years.  Not once
12:07 20    have I ever gotten a ticket or got into trouble or got into
21    violence, and I've been in the kitchen for 3 years, yet a lot
22    of people have been terminated from the kitchen for their
23    misbehaviors.  Given that fact, your Honor, all I wanted to say
24    is I hope that God puts mercy in your heart and wisdom in your
12:07 25    tongue when you make your judgment, sir.  That's it.

|     |     |                                                                |
| --- | --- | -------------------------------------------------------------- |
|         | 1   | THE COURT:  Thank you. |
|         | 2   | Do counsel know of any reason why sentence ought not |
|         | 3   | to be imposed at this time?  Miss Porter? |
|         | 4   | MS. PORTER:  No, your Honor. |
| 12:08  | 5   | THE COURT:  Mr. Shea? |
|         | 6   | MR. SHEA:  No, your Honor. |
|         | 7   | THE COURT:  Please stand, Mr. Alkayisi. |
|         | 8   | Your crime of organizing and leading a conspiracy to |
|         | 9   | distribute huge amounts of methamphetamines as part of a |
| 12:08  | 10  | violent criminal enterprise over an extended period of time is |
|         | 11  | not only despicable but also almost certainly caused untold |
|         | 12  | pain and suffering to vulnerable drug addicts.  This sort of |
|         | 13  | drug trafficking is a plague on our society and the only way to |
|         | 14  | stop it is to send the perpetrators to jail for long enough to |
| 12:09  | 15  | impress upon them and to those who would do likewise that it is |
|         | 16  | not worth it. |
|         | 17  | You know, Mr. Alkayisi, this case is particularly |
|         | 18  | troubling to this Court because you weren't a drug dealer |
|         | 19  | because you were starving and had no other way to make a living |
| 12:09  | 20  | or because you were an addict who needed money to feed your |
|         | 21  | habit.  No.  You are an educated person with an upper class |
|         | 22  | upbringing perfectly capable of earning an honest living who |
|         | 23  | simply chose to become a drug dealer out of greed and to make |
|         | 24  | big profits in the country that allowed you to emigrate into |
| 12:09  | 25  | it.  That is unconscionable and inexcusable. |

1          The drug you chose to deal in is methamphetamine, one

2     of the most deadly drugs on the street and responsible for

3     untold grief and suffering among our people.  Again, it is a

4     plague on our population which has caused egregious pain and

12:10   5     suffering to our most vulnerable victims and citizens.  You are

6     being held accountable for the distribution of hundreds of

7     kilograms of this poison.

8          I'm going to punish you and administer a sentence that

9     is very, very long but not as long as the government requests

12:10  10     because I believe that is a Draconian amount of time, but the

11     sentence is intended to send a message to you and to anyone

12     else who would do likewise.  This society is not going to

13     tolerate this sort of drug trafficking in our midst.  It just

14     is not.

12:11  15          Pursuant to the Sentencing Reform Act of 1984 and

16     having considered the sentencing factors enumerated in Title 18

17     of the United States Code Section 3553(a), it is the Judgement

18     of this Court that you, Reshat Alkayisi, are hereby committed

19     to the custody of the Bureau of Prisons, to be imprisoned for a

12:11  20     term of 276 months.  This term consists of 216 months on

21     Superseding Counts One and Three to Five, and 60 months on

22     Superseding Count Two, to be served consecutively to the terms

23     imposed on Superseding Counts One and Three through Five.

24          Upon release from imprisonment, you shall be placed on

12:12  25     supervised release for a term of 5 years.  This term consists

1    of 5 years on Counts One, Superseding Counts One and Two, and

2    3 years on Counts Three, Superseding Counts Three, Four, and

3    Five, such terms to run concurrently.

4         Within 72 hours of release from custody of the Bureau

12:12 5   of Prisons, you shall report in person to the district to which

6    you are released.

7         No fine is imposed as it is deemed you do not have the

8    financial ability to pay a fine.

9         While under the Probation Office's supervision, you

12:12 10  are to comply with the following terms and conditions:  First,

11   you shall not commit another federal, state or local crime.

12   You shall not unlawfully possess a controlled substance.  You

13   shall refrain from any unlawful use of a controlled substance

14   and submit to one drug test within 15 days of release from

12:13 15  imprisonment and at least two periodic drug tests thereafter,

16   not to exceed 50 tests per year.  You must cooperate in the

17   collection of a DNA sample as directed by the Probation Office.

18        You are to comply with the standard conditions that

19   have been adopted by this Court and are described in sentencing

12:13 20  guideline Section 5D1.3(c), which will be set forth in detail

21   in the Judgment and Committal.

22        The following special conditions apply during

23   supervised release:  If ordered deported, you shall leave the

24   United States and not return without the prior permission of

12:13 25  the Secretary of the Department of Homeland Security.  You are

1    prohibited from frequenting establishments whose primary

2    purpose is gambling.  You are prohibited from participating in

3    any gambling activities, including casino gambling, online

4    gambling, lotteries, instant scratch tickets, Keno or any other

12:13  5    activities similar in nature.  You must attend a gambling

6    specific treatment program and/or meetings as directed by the

7    Probation Office, and you are required to contribute to the

8    costs of evaluation, treatment, programming and/or monitoring

9    of the special conditions hereby imposed based upon your

12:14 10   ability to pay or the availability of third-party payment.

11        It is further ordered that you shall pay to the United

12   States a Special Assessment of $500, which shall be due and

13   payable immediately.

14        Mr. Alkayisi, you have a right to appeal this

12:14 15   sentence.  If you choose to appeal, you must do so within

16   14 days.  If you cannot afford an attorney, an attorney will be

17   appointed on your behalf.

18        Do you understand that?

19        THE DEFENDANT:  Yes, your Honor.

12:14 20   THE COURT:  Is there any further business to come

21   before the Court in these proceedings?

22   ████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ██████████████████████████████████████████████

12:14 25   ████████████████████████████



1

2

3

4

12:15  5

6

7

8

9           MR. SHEA:  The only thing I realized, Judge,

12:15 10  Mr. Alkayisi's family is all located in California.  His wife

11  is in California.  We're just asking if the Court could ask

12  that the Bureau of Prisons use a California address as opposed

13  to the non-existent Rhode Island address for the purposes of

14  determining where he lives.

12:15 15           THE COURT:  Yes.  The Court will make a recommendation

16  that the Bureau of Prisons incarcerate the defendant in a

17  facility in or near California where the defendant has

18  relatives.

19           MR. SHEA:  Thank you.

12:15 20           THE COURT:  We're adjourned.

21           THE CLERK:  All rise.  The defendant is remanded.

22           (The Honorable Court exited.)

23           (Adjourned, 12:16 p.m.)

24

25

1                    C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8         I, Kristin M. Kelley, certify that the foregoing is a

9    correct transcript from the record of proceedings taken

10   September 17, 2024 in the above-entitled matter to the best of

11   my skill and ability.

12

13

14       /s/ Kristin M. Kelley              October 30, 2024

15       Kristin M. Kelley, RPR, CRR              Date
         Official Court Reporter
16

17

18

19

20

21

22

23

24

25